UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE NARRAGANSETT ELECTRIC COMPANY,

Plaintiff,

v.

TRANSCANADA POWER MARKETING LTD.,

Defendant.

C.A. No. 05-234S

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, STAY, OR TRANSFER**

Plaintiff, The Narragansett Electric Company ("Narragansett"), hereby objects to the motion to dismiss, stay, or transfer of Defendant, TransCanada Power Marketing Ltd. In support of its objection, Narragansett relies on the memorandum of law and the Affidavit of Michael J. Hager submitted herewith.

THE NARRAGANSETT ELECTRIC COMPANY
By its Attorney,

Gerald J. Petros, Esq. (#2931)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (FAX)

DATED: July 8, 2005.

**CERTIFICATION**

To:

Kristin E. Rodgers
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

Cynthia Lomas
____________________________

665983v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-234S |
| TRANSCANADA POWER MARKETING LTD., | : | |
| Defendant. | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, STAY, OR TRANSFER**

## I. INTRODUCTION

Plaintiff, The Narragansett Electric Company ("Narragansett"), submits this memorandum in opposition to the motion of Defendant, TransCanada Power Marketing Ltd. ("TransCanada"). TransCanada filed a parallel action about one week earlier in federal court in Massachusetts. This Court should deny TransCanada's motion to dismiss, stay, or transfer this action for several reasons.

First, most of the state's electric customers, plus the government of Rhode Island – notably the Rhode Island Public Utilities Commission ("RIPUC"), which sets the prices that Narragansett can charge its customers – have a powerful interest in the outcome of this dispute. TransCanada, a wholesale electric power supplier of Narragansett under a long term contract, seeks to require Narragansett to pay more under the contract and/or to terminate the contract. The contract is currently uneconomic for TransCanada, and its termination would force Narragansett to buy more expensive power at current market prices. If TransCanada succeeds, over 475,000 Rhode Island consumers served by

Narragansett – including individual residents, businesses, hospitals, educational and charitable institutions, and federal, state, and municipal entities – would have to pay more money for their electricity.

By contrast, the government and citizens of Massachusetts have virtually no interest in the resolution of this conflict, which involves solely a contract to supply power to a Rhode Island electric distribution company for the benefit of its Rhode Island retail customers. In light of this overwhelming Rhode Island interest, this matter should proceed before this Court.

Second, TransCanada is not entitled to the benefits of "first-filed" status in this dispute. Although TransCanada "beat" Narragansett to the courthouse, TransCanada's "methods" in so doing divest it of first-filed status. In particular, TransCanada created a false start by racing to the courthouse steps in the middle of substantive settlement negotiations with Narragansett. Federal courts do not reward litigants for such questionable maneuvers. Moreover, TransCanada is not the natural plaintiff in this dispute. From the beginning, Narragansett has made, under protest and with full reservation of rights, all of the payments that TransCanada claimed were due and owing under its illegitimate interpretation of the WSOS Agreement. Narragansett continues to make these payments even today, and did not sue to recover them until TransCanada abruptly filed its Massachusetts action in the middle of settlement negotiations. Finally, the balance of convenience weighs in favor of Rhode Island, particularly with the likely involvement of the RIPUC and the Rhode Island Division of Public Utilities and Carriers ("Rhode Island Division") as witnesses.

For all of these reasons, explained more fully below, the Court should deny TransCanada's motion to dismiss, stay, or transfer, and should proceed to determine this dispute that so directly affects the government and businesses and residents of this state.

## II. FACTS

### A. The Parties

Narragansett is a specially chartered Rhode Island public utility corporation with its principal place of business in Rhode Island. It is an electric distribution company whose charter permits it to deliver electricity over its wires to retail customers in thirty-eight Rhode Island cities and towns, with a population of over 1 million people. Michael J. Hager Aff. ¶ 5. Narragansett is the largest such electric utility in Rhode Island, serving most of that State's customers. Id. It presently delivers electricity to approximately 480,000 customers, of which over 475,000 receive standard offer service. Id. Narragansett has the exclusive right to own and operate distribution equipment for delivery of electricity at retail in these cities and towns. Id. Unlike non-utility companies, Narragansett does not set the prices at which it provides these services. Rather, it sells and delivers electricity pursuant to retail tariffs that the RIPUC has approved. Narragansett is wholly owned by National Grid USA ("National Grid"), a public utility holding company. Id. at ¶ 4.

TransCanada, a Delaware corporation, is a power marketing company that sells electricity at wholesale to Narragansett. Its eastern operations – conducted from an office – are headquartered in Massachusetts. Id. at ¶ 23. Its other operations are in Calgary, Alberta, Canada and Toronto, Ontario, Canada. Id.

Narragansett's predecessor companies, Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") also were retail electric distribution companies in Rhode Island. Like Narragansett, Blackstone and Newport provided their services pursuant to retail tariffs approved by the RIPUC. Eastern Utilities Associates ("EUA"), a public utility holding company, had owned Blackstone, Newport, and Montaup Electric Company ("Montaup"), the wholesale electricity supplier to Blackstone and Newport. On May 1, 2000, Blackstone and Newport merged with and into Narragansett. At the same time, National Grid acquired EUA, and Montaup merged with and into New England Power Company, another subsidiary of National Grid USA. Consequently, Narragansett became the retail electric supplier and distribution company for Blackstone and Newport's customers, in addition to its already existing customers.

**B. The WSOS Agreement**

On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement. Under the Asset Purchase Agreement, TransCanada (1) purchased rights and obligations under a power purchase agreement between Montaup and the Ocean State Power ("OSP") generation station in Burrillville, Rhode Island; (2) entered into a PPA Transfer Agreement to effectuate the OSP purchase power obligations; and (3) agreed to supply a specific percentage share of electricity required by Blackstone and Newport to serve their Rhode Island customers. In connection with its supply obligation, TransCanada entered into a Wholesale Standard Offer Service Agreement ("WSOS Agreement") with Blackstone and Newport.[1]

[1] The Agreement also required TransCanada to supply electricity to Eastern Edison, a Massachusetts retail distribution company subsidiary of EUA. However, the term of that supply obligation ended in 2004. As a result, TransCanada's remaining supply obligations relate solely to the former EUA companies in Rhode Island, Newport and Blackstone, which subsequently merged into Narragansett.

At the heart of this dispute is the WSOS Agreement's fuel adjustment clause. Pursuant to this clause, Blackstone and Newport (now Narragansett) were obligated to pay a Fuel Adjustment Factor ("FAF") to TransCanada, as that FAF was to be reflected in their retail tariffs. The WSOS Agreement made clear that Blackstone and Newport's obligations to make payments under the FAF was conditioned upon the RIPUC approving the FAF in their tariffs.

Shortly after the WSOS Agreement was executed, Blackstone and Newport filed identical retail tariffs that contained the FAF. By its terms, the FAF commenced in the year 2000 and expired after 2004.[2] There were no provisions in the tariffs that provided for extending the FAF beyond 2004. These retail tariffs were approved by the RIPUC by order issued July 10, 1998. See July 10, 1998 Order, attached as Exhibit A. The FAF remained in the Blackstone and Newport tariffs, unchanged, through the date that Blackstone and Newport merged into Narragansett.

In anticipation of the pending merger of Narragansett, Blackstone and Newport, by letter dated February 8, 2000, Narragansett informed TransCanada that it would pay an FAF consistent with Blackstone and Newport's RIPUC-approved retail tariffs. Accordingly, Narragansett attached to the correspondence a schedule containing a fuel adjustment for each year from 2000 through 2004. Narragansett sent this letter to TransCanada in draft form and asked TransCanada to review it. Representatives from TransCanada and Narragansett communicated regarding the letter, and TransCanada

---

[2] While the filing was made on April 15, 1998, the standard offer service tariff containing an FAF expiring after 2004 was virtually identical to a proposed standard offer service tariff that had been filed at the RIPUC in November of 1997. At that time, however, the RIPUC delayed approval. Instead, the RIPUC put interim tariffs into effect and required Blackstone and Newport to put the standard offer out to bid before approving any standard offer tariffs. Once the bidding process was completed, Blackstone and Newport refiled on April 15, 1998. The discussion of this filing history also is contained in the RIPUC's order issued July 10, 1998.

voiced no objections to the contents of the same. Thus, on April 18, 2000, Narragansett put the draft letter in final form and sent it to TransCanada.

**C. Proceedings Before the RIPUC**

Subsequent to the merger, Narragansett administered the WSOS Agreement consistent with its understanding that the FAF would expire after 2004. In fact, at several proceedings before the RIPUC, Narragansett expressed this understanding to the RIPUC. These proceedings were noticed and open to the public. Furthermore, in recent years, the RIPUC has made its orders and notices available on the web. Examples of the several public proceedings before RIPUC include: in June of 2000, Narragansett explained to the RIPUC that payment of an FAF for the wholesale standard offer service agreements for the former EUA companies Blackstone and Newport (the "EUA Zone WSOS Agreements") would end after 2004. On May 28, 2003, in another public hearing before the RIPUC, Narragansett explained its understanding of the WSOS Agreement that it was not obligated to make FAF payments under the EUA Zone wholesale standard offer service agreements after 2004. Consistent with its understanding of the WSOS Agreement, Narragansett filed with the RIPUC proposed standard offer rates that were based on a forecast of power costs that assumed no FAF payments would be made under the EUA Zone wholesale standard offer service agreements after 2004. Additionally, on July 1, 2004, Narragansett filed an application with the RIPUC to set its rates effective as of October 1, 2004. Again, the filing proposed rates based on a forecast of costs that assumed no FAF payments being made to TransCanada after 2004.

The RIPUC approved Narragansett's rates effective August 1, 2004 pursuant to an open meeting decision on July 26, 2004 and an order dated August 26, 2004.

Likewise, on November 10, 2004, Narragansett made another publicly-noticed filing with the RIPUC relative to retail standard offer service. This filing proposed rates based on a forecast that no FAF payments would be made with regard to the EUA Zone wholesale standard offer service agreements. A bench decision delivered at a public hearing on December 13, 2004, and confirmed by a written order issued February 17, 2005, approved Narragansett's filing.

TransCanada failed to participate in these hearings. As the RIPUC acknowledged in a letter to Michael Hachey of TransCanada,

> TransCanada has chosen not to participate in those publicly noticed hearings. As I am sure you are aware, all members of the public, including suppliers, are invited to participate through the public comment process at the Commission. Additionally, all Narragansett rate filings are posted on the Commission's website prior to the hearings as are all Commission Orders shortly after their issuance.

See Apr. 6, 2005 Letter, attached as Exhibit B.

Consistent with its understanding of the WSOS Agreement, the terms of the retail tariff that had been initially approved by the RIPUC in 1998, the April 18, 2000 letter that had been sent to TransCanada at the time of the merger, and its filings with the RIPUC, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.

**D. Negotiations**

After Narragansett did not make any FAF payments for the month of January 2005, TransCanada complained to Narragansett. Michael J. Hager Aff. ¶ 7. In February of 2005, Narragansett and TransCanada initiated discussions concerning their respective understandings of the FAF clause. Id. On February 18, 2005, TransCanada invoked the

dispute resolution clause of the WSOS Agreement, calling for senior representatives of TransCanada and Narragansett to meet. Id. at ¶ 8. At a meeting on March 7, 2005, the parties broached the subject of an amicable resolution. Id. at ¶ 9. At that same meeting, TransCanada expressed a strong interest in an expedited resolution, and the parties discussed a fast-track arbitration. Id.[3]

On March 1, 2005, TransCanada sent a letter to Narragansett (1) claiming that Narragansett was in default of the WSOS Agreement by not providing for an FAF in its price calculations; (2) asserting that Narragansett had breached the WSOS Agreement by refusing "to comply with its obligations under Article V before the ... [RIPUC] with respect to its Standard Offer Service tariffs"; and (3) asserting that "Narragansett's failure to cure or rectify a notice default ...shall be deemed an Event of Default...." See Mar. 1, 2005 Letter, attached as Exhibit 3 to Def.'s App. in Supp. of Aff. of William Taylor.

At the end of March, Narragansett began making payments to TransCanada, under protest (including retroactive protest payments for the period beginning in January), to allow the parties to negotiate a potential settlement, and avoid giving TransCanada a pretext to terminate the WSOS Agreement, which, based on current market prices, is no longer economically advantageous to TransCanada. Michael J. Hager Aff. ¶ 11.

Confidential settlement negotiations continued and on April 1, 2005, TransCanada and Narragansett also began negotiating an agreement for a fast-track arbitration. Id. at ¶ 12. The agreement for a fast-track arbitration was heavily negotiated. Id. at ¶ 13. It was nearly complete when TransCanada and Narragansett had made

[3] The parties agreed that this meeting was subject to Federal Rule of Evidence 408 and similar state laws. The meeting is described here not "to prove liability," but to explain the context of TransCanada's rush to the courthouse.

substantial progress towards a settlement agreement in principle of a large portion of the dispute. Id. At that time, on April 25, 2005, TransCanada's legal counsel sent an electronic mail message to Gloria Kavanah, National Grid's Assistant General Counsel, indicating TransCanada's willingness to hold off on finalizing the arbitration agreement due to the progress being made in settlement negotiations. Id. at ¶ 14.

TransCanada and Narragansett were actually exchanging drafts of the partial settlement agreement when TransCanada filed suit in the United States District Court for the District of Massachusetts on May 17, 2005. Id. at ¶ 15. Nine days later, on May 26, 2005, Narragansett filed this action in the United States District Court for the District of Rhode Island.

At no time did TransCanada indicate that it no longer intended to arbitrate the dispute (or in the event of a settlement of a portion of the dispute, the remaining portion of the dispute.) Id. at ¶ 16. Moreover, TransCanada at all times indicated its strong interest in an expedited resolution. Id. at ¶ 17. Accordingly, Narragansett persisted in its belief that TransCanada continued to desire a fast-track arbitration. Id. Finally, Narragansett had no reason to believe that TransCanada would file suit since TransCanada was receiving all of the disputed FAF payments at that time. Id. at ¶ 18.

**E. Other Facts Bearing on the Balance of Convenience**

**1. The Rhode Island Regulatory Agencies' Involvement in this Dispute**

As regulatory agencies, the RIPUC and the Rhode Island Division have an integral and essential role in this dispute. The RIPUC and the Rhode Island Division possess "the exclusive power and authority to supervise, regulate, and make orders governing the conduct of companies offering to the public in intrastate commerce energy

... for the purpose of protecting ... the public against improper and unreasonable rates, tolls and charges." R.I. Gen. Laws § 39-1-1(c). Furthermore, an electric distribution company may not terminate an existing standard offer wholesale supply agreement absent the Division's written consent. R.I. Gen. Laws § 39-1-27.3(b).

TransCanada acknowledges the role of the RIPUC in this dispute. On or about March 29, 2005, Michael Hachey of TransCanada contacted counsel for the RIPUC and requested a meeting with the regulators regarding this dispute. Michael J. Hager Aff. ¶ 10. In a letter to the RIPUC dated April 4, 2005, Hachey acknowledged the possibility of termination of the WSOS Agreement and the implications of the dispute for Rhode Island customers. See April 4, 2005 Letter, attached as Exhibit C. The RIPUC responded to Hachey, noting that "any rate impact of any changes to a Standard Offer Service ... Contract would be subject to Commission approval." See April 6, 2005 Letter, attached as Exhibit B.

**2. Location of the Parties, Witnesses, and Evidence**

Narragansett's principal place of business is 280 Melrose Street, Providence, Rhode Island. Narragansett's business lead for the WSOS Agreement, Michael J. Hager, an employee of National Grid USA Service Company, lives equidistant between Worcester and Providence. Michael J. Hager Aff. ¶ 2, 3, and 6.

Narragansett employs over 470 persons in Rhode Island. Id. at ¶ 22. Upon information and belief, TransCanada has 8 to 10 employees in an office in Westborough, Massachusetts. Id. Furthermore, although TransCanada's Eastern division operations are located in Massachusetts, TransCanada also does business in Calgary, Alberta, Canada

and Toronto, Ontario, Canada.[4] Id. at ¶ 23. TransCanada's employees in Burrillville, Rhode Island performed TransCanada's accounting services for the WSOS Agreement and the PPA Transfer Agreement since 1998 up until two days before TransCanada filed its motion to dismiss, stay, or transfer. Id. at ¶ 26.

The PPA Transfer Agreement for output from the OSP generation station is intertwined with the WSOS Agreement. Both the PPA Transfer Agreement and the WSOS Agreement have cross-default provisions. See PPA Transfer Agreement, Article 13, attached as Exhibit D; WSOS Agreement, Article 8(2), attached as Exhibit 1(A) to Def.'s Mem. In Support of its Mot. to Dismiss, Stay, or Transfer. Accordingly, the PPA Transfer Agreement may be implicated in this litigation.

Much of the documentary evidence that Narragansett will introduce at trial is available in electronic form. Michael J. Hager Aff. ¶ 19. Furthermore, negotiations prior to TransCanada's filing of suit in Massachusetts took place in both Rhode Island and Massachusetts. Id. at ¶ 20. All hearings before the RIPUC, at which the retail fuel adjustment relative to the EUA Wholesale Standard Offer Service Agreements were discussed, took place in Rhode Island. Id. at ¶ 21.

## III. ARGUMENT

### A. The Court Should Deny TransCanada's Motion to Dismiss

TransCanada's motion to dismiss, stay, or transfer relies exclusively on the first-filed rule. That reliance is misplaced. The first-filed rule "is not a per se rule, but rather a policy governed by equitable considerations." Feinstein v. Brown, 304 F.Supp.2d 279, 283 (D.R.I. 2004); SW Industries, Inc. v. Aetna Casualty & Surety Co., 653 F. Supp. 631,

[4] On information and belief, Michael Hachey, one of TransCanada's business leads, owns a residence in Rhode Island and spends almost every weekend there. Id. at ¶ 25.

634 (D.R.I. 1987). Accordingly, courts refuse to apply the first-filed rule mechanically and recognize various exceptions to the rule. 17 Moore's Federal Practice § 111.13[1][o][B] (Matthew Bender 3d ed.). See also Glades Pharmaceuticals v. Call, Inc., No. Civ. A. 04-4259, 2005 WL 563726, at *8 (E.D. Pa. Mar. 9, 2005) (stating that "the first-filed rule is not a rigid or inflexible rule to be mechanically applied"); Affinity Memory & Micro v. K & Q Enter., 20 F. Supp. 2d 948, 954 (E.D. Va. 1998) (noting that "the first-filed rule is not to be applied mechanically" and that the court should perform "a thorough transfer analysis ... to determine if the balance of convenience favors transfer"); 800-Flowers v. Intercontinental Florist, 860 F. Supp. 128, 133 (S.D.N.Y. 1994) (stating that "[i]t is well established that district courts need not slavishly adhere to the first filed rule"). Furthermore, "courts generally give less weight to the first-filed rule when the competing actions were filed within a short time of each other." 17 Moore's Federal Practice § 111.13[1][o][B] (Matthew Bender 3d ed.).

Two well-settled exceptions to the first-filed rule apply where (1) special circumstances justify giving priority to the second filed suit or (2) the balance of convenience favors the second suit. Feinstein, 304 F.Supp.2d at 283. Both of those exceptions apply here.

### 1. The Court Should Deny the Motion to Dismiss Because the Government and Residents of Rhode Island have an Enormous Interest in the Resolution of this Dispute.

The RIPUC and the Rhode Island Division extensively regulate the electric industry in Rhode Island. The RIPUC possesses "the exclusive power and authority to supervise, regulate, and make orders governing the conduct of companies offering to the public in intrastate commerce energy ... for the purpose of protecting ... the public

against improper and unreasonable rates, tolls and charges." R.I. Gen. Laws § 39-1-1(c). Accordingly, a retail electric distribution company charges its customers rates under public tariffs that are reviewed and approved by the RIPUC. R.I. Gen. Laws §§ 39-1-3(a); 39-1-27(a). Furthermore, an electric distribution company may not terminate an existing standard offer wholesale supply agreement absent the Division's written consent. R.I. Gen. Laws § 39-1-27.3(b).

This case should be litigated in Rhode Island because the contract dispute at issue is inextricably intertwined with the RIPUC's regulation of the rates that Narragansett can charge its customers and because Rhode Island residents, businesses, and other electric consumers have a strong interest in the outcome of this dispute. TransCanada seeks: (1) to terminate its power supply contract, and (2) to obtain FAF payments for as long as the contract remains in effect. Narragansett does not believe that TransCanada is entitled to any relief in this proceeding. Nevertheless, either prong of the relief requested by TransCanada would increase the rates for hundreds of thousands of Rhode Island businesses and residents.

Under Rhode Island law, Narragansett is entitled to recover its costs under standard offer service agreements from approximately 54,832 businesses and 420,759 residents that receive standard offer service. See R.I. Gen. Laws § 39-1-27.3(b) (stating that "[t]he electric distribution company will be entitled to recover its costs incurred from providing the standard offer arising out of ... wholesale standard offer supply agreements ... in effect prior to January 1, 2002"). If Narragansett is required to pay more to TransCanada under the WSOS Agreement, Narragansett will be forced to recover those increased costs from its customers. If TransCanada is allowed to terminate the WSOS

Agreement, then Narragansett will be forced to purchase more expensive market power, the costs of which, under Rhode Island law are recoverable. See R.I. Gen Laws § 39-1-27.3(b) (stating that "[t]he electric distribution company will be entitled to recover its costs incurred from providing the standard offer arising out of ... power supply related arrangements prudently made after January 1, 2002, to provide standard offer supply or to mitigate standard offer supply costs"). Therefore, if this Court accepts TransCanada's contract arguments – which it should not – Rhode Island residents, businesses, governmental, educational and charitable institutions will face higher energy costs.

The Rhode Island public's interest demands resolution of this dispute in Rhode Island. "When an action involves an incident occurring in a particular locale, there is a public interest in having the controversy adjudicated in that locale, rather than in a remote forum." 17 Moore's Federal Practice § 111.13[1][l] (Matthew Bender 3d ed.). See also In re Eastern Dist. Repetitive Stress Injury Litigation, 850 F.Supp. 188, 195 (E.D.N.Y. 1994) (stating that "[w]hen an action involves injuries sustained in a particular locale, the public interest supports adjudication of the controversy in that locale, where it may be a matter of local attention, rather than in a remote location where it will be learned of only by report").

This case involves events occurring exclusively in Rhode Island; specifically, the purchase of electricity in Rhode Island, on behalf of Rhode Island electric consumers, at rates set by Rhode Island regulatory authorities. The more than 475,000 customers of the power supplied by TransCanada are located exclusively in Rhode Island. Narragansett and its predecessors, Blackstone and Newport, are Rhode Island corporations. By statute, Narragansett has the exclusive authority to distribute electricity to customers in its

franchised territory in Rhode Island. Michael J. Hager Aff. ¶ 5. It has no other authority and engages in no other business. Finally, this case involves relevant proceedings that took place before the RIPUC.

In short, this case is important to the residents of Rhode Island and it directly concerns the State's intensive regulation of the supply and sale of electricity. The residents and government of Massachusetts have no interest in this dispute. For this reason, this dispute should be determined in Rhode Island by this Court.

**2. The Court Should Deny TransCanada's Motion to Dismiss Because the First-Filed Rule Does Not Apply Here.**

Where the first-filed action results from "a preemptive race to the courthouse," or is filed "for the sole purpose of winning the race to the courthouse to secure a preferred forum," special circumstances exist, and the first-filed rule does not apply. Feinstein, 304 F.Supp.2d at 283; Holmes Group, Inc. v. Hamilton Beach/Proctor Silex, Inc., 249 F.Supp.2d 12, 16 (D. Mass. 2002). Furthermore, where one party reasonably holds off from filing suit because he or she believes the parties are still negotiating, special circumstances exist that preclude application of the first-filed rule. Nortek, Inc. v. Molnar, 36 F.Supp.2d 63, 70 (D.R.I. 1999). See also Holmes Group, Inc., 249 F.Supp.2d at 16 (stating that the first-filed rule does not apply where "a plaintiff ... misleads the defendant into foregoing litigation in order to negotiate a settlement and then files suit"). A court "will not reward conduct that undermines the sound policy of promoting settlements and negotiations outside the courthouse." Nortek, Inc., 36 F.Supp.2d at 70.

Additionally, in the case of concurrent actions proceeding in different federal courts, courts often note which of the parties constitutes the "natural plaintiff." "The natural plaintiff's choice of forum ... will be disturbed only in exceptional

circumstances." AmSouth Bank v. Dale, 386 F.3d 763, 788 (6th Cir. 2004). See also Old Town Canoe Co. v. Confluence Holdings Corp., No. Civ. 04-1660-AS, 2005 WL 552005, at *2 (D. Or. 2005) (noting that the natural plaintiff's choice of forum should not be disturbed in the absence of a strong showing of inconvenience).

TransCanada is not entitled to the benefits of the first-filed rule for at least two reasons. First, TransCanada engaged in "conduct that undermines the sound policy of promoting settlements and negotiations outside the courthouse." Narragansett and TransCanada were engaged in negotiations for upwards of two months when TransCanada unexpectedly filed its Massachusetts action. TransCanada lured Narragansett into a false sense of security by invoking the dispute resolution clause of the WSOS Agreement and insisting on fast-track arbitration. Furthermore, TransCanada's counsel told Narragansett to hold off on finalizing the arbitration agreement due to the progress being made in settlement negotiations. Because negotiations had proven fruitful, as evidenced by the partial settlement and TransCanada's counsel's statement, and Narragansett continued to pay under protest, Narragansett had every reason to believe that the parties would resolve their dispute without a court action. TransCanada took advantage of the false sense of security it provided Narragansett and ambushed Narragansett to secure its preferred forum of Massachusetts.

Second, TransCanada's actions are even more pernicious because Narragansett, not TransCanada, was the only party suffering any actual harm at the time that TransCanada filed its lawsuit. While the parties attempted to resolve this dispute, Narragansett made payments under protest to TransCanada for each month, beginning in January of 2005. Therefore, when it filed suit, TransCanada already possessed all of the

money it claimed was due in connection with the dispute. Narragansett, on the other hand, was out more than $1,000,000, having made payments to allow the parties to negotiate and to avoid termination of a power supply that is advantageous for Rhode Island customers. To this day, Narragansett continues to make these payments. Michael J. Hager Aff. ¶ 11. Thus Narragansett, not TransCanada, was the party suffering damages at the time that TransCanada filed its lawsuit. Narragansett, not TransCanada, is the natural plaintiff.

**3. The Balance of Convenience Favors Narragansett's Rhode Island Based Suit.**

In addition to the preemptive race to the courthouse, a balance of convenience favoring the venue of a later-filed action precludes application of the first-filed rule. Feinstein, 304 F.Supp.2d at 283. The party seeking transfer must demonstrate that the plaintiff's choice of forum is substantially more inconvenient than proceeding in its choice of forum. Id. at 284. See also Kleinerman v. Luxtron Corp., 107 F.Supp.2d 122, 125 (D. Mass. 2000) (stating that "[t]he party seeking to demonstrate that one forum is more convenient than another ... must show that the plaintiff's choice of forum is substantially more inconvenient than the alternative proposed by it"). TransCanada has not met this burden, and, in fact, inaccurately attempts to place the burden of proof upon Narragansett. See Def.'s Mem. in Support of its Mot. to Dismiss, Stay, or Transfer at 2 (stating that "in the absence of an affirmative showing by Narragansett that a Rhode Island forum is clearly preferable, this second-filed action should be dismissed").

In analyzing the balance of convenience, courts weigh the following factors: (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of witnesses and the location of documents; (4) any connection between the forum and the

issues; (5) the law to be applied; and (6) the state or public interest at stake. Holmes Group, Inc., 249 F.Supp.2d at 17.

**a. The Plaintiff's Choice of Forum**

In general, "[u]nder both the doctrine of forum non conveniens and the statutory provision for transfer of venue, the plaintiffs forum choice is generally preferred." SW Industries, Inc., 653 F.Supp. at 637. This preference for the plaintiff's choice of forum is especially strong where the plaintiff has filed suit in its home forum. Kleinerman, 107 F.Supp.2d at 125. "When a plaintiff chooses his home forum, the choice more likely represents considerations of convenience rather than vexation or harassment to the defendant, thus elevating the hurdle the defendant is required to clear to warrant transfer." Id. As Narragansett has filed suit in Rhode Island, where it maintains its principal place of business, this factor favors a Rhode Island venue for this dispute.

**b. The Convenience of the Parties**

Narragansett is a Rhode Island corporation with its principal place of business, and all of its equipment and customers, in Rhode Island. TransCanada is a Delaware corporation with its small headquarters office in Massachusetts, and other operations in Canada. TransCanada sells electricity to Narragansett, which Narragansett provides to Rhode Island consumers. As Narragansett and TransCanada have their principal places of business in different states, this factor is neutral.

**c. Connections Between the Forum and the Issues**

Both Narragansett's Rhode Island lawsuit and TransCanada's Massachusetts lawsuit arise from the delivery of electricity to Narragansett for consumption by Rhode Island consumers. Rhode Island has a strong interest in the potential termination of the

WSOS Agreement, since the increased costs from any payments to TransCanada and/or termination will be passed on to Rhode Island customers by operation of R.I. Gen. Laws § 39-1-27.3(b), discussed *infra*. Consequently, the direct connection between Rhode Island and the issues central to this dispute is undeniable.

**d. The Law To Be Applied**

Of the balance of convenience factors, the law to be applied "seems not to have been given great weight, particularly when the applicable state law appears clear." SW Industries, Inc., 653 F.Supp. at 638-39 (citing Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3854). See also Paradis v. Dooley, 774 F. Supp. 79, 82 (D.R.I. 1991) (stating that "[c]hoice of law is not a controlling factor in deciding this motion [for transfer of venue] because a transferee court would apply the same state law that the transferor court would have applied").

The WSOS Agreement provides for the application of Massachusetts law. As Massachusetts law concerning the interpretation of contracts is fairly clear, this factor bears little weight. Although Massachusetts law governs the WSOS Agreement, the Rhode Island statute regarding Standard Offer Service and proceedings, orders, rules, and regulations of the RIPUC is at the heart of this dispute, since the same contract prohibited TransCanada from collecting a FAF unless and to the extent that the RIPUC permitted Narragansett to recover such costs in its retail tariffs. Moreover, the WSOS Agreement initially covered supply to three EUA companies, Eastern Edison, Newport, and Blackstone. Eastern Edison, which served customers in Massachusetts, was the largest of the three EUA companies. Michael J. Hager Aff. ¶ 27. TransCanada's obligations to supply Eastern Edison expired in 2004. Thus whether the application of Massachusetts

law would have had a bearing on venue in the past, it no longer is entitled to such consideration.

## IV. CONCLUSION

As special circumstances apply and the balance of convenience favors Rhode Island as the appropriate venue for this action, the first-filed rule does not apply and the Court should deny TransCanada's motion to dismiss, stay, or transfer Narragansett's lawsuit to Massachusetts.

THE NARRAGANSETT ELECTRIC COMPANY
By its Attorney,

Gerald J. Petros, Esq. (#2931)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (FAX)

DATED: July 8, 2005.

## CERTIFICATION

To:

Kristin E. Rodgers
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

I certify that I mailed a true and accurate copy of this Memorandum in Opposition to Defendant's Motion to Dismiss, Stay, or Transfer to counsel of record, as stated above, on July 8th, 2005.

Cynthia Lomas

665645v4