# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>TRANSCANADA POWER MARKETING LTD.,<br>Defendant. | 05 234S<br>C.A. No. 05- |

FILED MAY 2 U.S. DIS DISTRICT C

COMPLAINT

Plaintiff, The Narragansett Electric Company, brings this action against Defendant, TransCanada Power Marketing Ltd., for breach of contract and declaratory judgment.

PARTIES AND JURISDICTION

1. Plaintiff, The Narragansett Electric Company ("Narragansett"), is a Rhode Island corporation with its principal place of business at 280 Melrose Street, Providence, Rhode Island.

2. Defendant, TransCanada Power Marketing Ltd. ("TransCanada"), is a Delaware corporation with its principal place of business at 110 Turnpike Road, Westborough, Massachusetts.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000, exclusive of interest and costs, and Narragansett and TransCanada are citizens of different states.

FACTS COMMON TO ALL COUNTS

4. Narragansett is a retail electric distribution company that supplies and delivers electricity to 465,000 retail end-use customers in 38 communities in Rhode Island. Narragansett provides such service pursuant to retail tariffs, and at rates and under terms and conditions that the Rhode Island Public Utilities Commission (the "Rhode Island Commission") approves and regulates.

5. TransCanada is a power marketing company that sells electricity at wholesale to Narragansett.

6. Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") were retail electric supply and distribution companies in Rhode Island, and were wholly-owned subsidiaries of the Eastern Utilities Associates ("EUA"), a public utility holding company. EUA also owned Eastern Edison Company ("Eastern"), a retail electric supply and distribution company in Massachusetts, and Montaup Electric Company ("Montaup"), an affiliate of, and wholesale electricity supplier to, Blackstone, Newport and Eastern.

7. The Rhode Island Commission and the Rhode Island Division of Public Utilities and Carriers possess the exclusive power and authority to supervise, regulate, and issue orders governing the conduct of companies that provide energy to the public. They safeguard the public against improper and unreasonable rates and charges by providing full, fair, and adequate administrative procedures and remedies, and by securing a judicial review to any party aggrieved by such an administrative proceeding or ruling. R.I. Gen. Laws § 39-1-1(c).

8. On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement. Pursuant to the Asset Purchase Agreement, TransCanada bought certain electricity generation assets of Montaup, namely, a power purchase agreement ("PPA") between Montaup and the Ocean State Power generation station located in Burrillville, Rhode Island. The purchase was effectuated through a PPA Transfer Agreement. Also under the Asset Purchase Agreement, TransCanada agreed to provide to Blackstone, Newport and Eastern a specific percentage share of electric service that they needed to satisfy their electric supply obligations to their retail standard offer service customers. The supply obligation was effectuated through a Wholesale Standard Offer Service Agreement ("WSOS Agreement") with Blackstone, Newport, and Eastern.

9. Under the WSOS Agreement, Blackstone, Newport and Eastern are to pay to TransCanada a "Standard Offer Wholesale Price," which is defined as "the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy" as set forth in an appendix to the WSOS Agreement. WSOS Agreement, Art. 1, at 3; Appendix A, at 16. The schedule of prices rises over time and more than doubles during the ten-year term of the WSOS Agreement.

10. The WSOS Agreement also provides for the payment of a Fuel Adjustment Factor ("FAF") upon the occurrence and satisfaction of a specific condition precedent. The FAF is defined as:

> "... a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through

> the Fuel Adjustment Factor. *The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.*"

WSOS Agreement, Art. 5, at 5-6 (emphasis added).

11. The WSOS Agreement clearly spells out, in the FAF clause, that the FAF is only payable to TransCanada upon the occurrence of the Rhode Island Commission issuing a very specific approval for Blackstone's and Newport's retail tariffs which govern the rates, terms and conditions of service to their standard offer service customers; namely, the inclusion of a Fuel Adjustment in the retail rates which allows Blackstone and Newport to collect an FAF payment from their retail customers who take service pursuant to the standard offer service tariff.

12. Blackstone's and Newport's Rhode Island Commission-approved retail standard offer service tariffs did not contain a Fuel Adjustment for 1998 and 1999 and did contain a Fuel Adjustment for each year from 2000 through 2004.

13. Effective May 1, 2000, Blackstone and Newport merged with and into Narragansett, and Eastern merged with and into Massachusetts Electric Company ("Massachusetts Electric"), a retail electric distribution company in Massachusetts. Narragansett and Massachusetts Electric are wholly owned by National Grid USA ("National Grid"), a public utility holding company.

14. Pursuant to the terms of the WSOS Agreement, TransCanada's and Massachusetts Electric's (as successor to Eastern) obligations that relate to service to Massachusetts Electric expired as of December 31, 2004. Accordingly, the only issues in

controversy are those that arise in relation to service in Rhode Island and retail rates as approved by the Rhode Island Commission.

15. The Rhode Island Commission approved the Narragansett-Blackstone and Newport merger (as well as the merger of their affiliates) in March of 2000 along with a rate settlement for the newly-merged entity and its customers. Order No. 16200, approving Third Amended Stipulation and Settlement, March 24, 2000, Docket 2930. As a result, Narragansett became the retail electric supplier and distribution company for Blackstone's and Newport's previous customers, in addition to its own existing customers.

16. On February 8, 2000, Narragansett's power supply manager informed TransCanada via letter of the merger, explained the manner in which the WSOS Agreement would be administered after the merger, and stated that the WSOS Agreement was not being modified in any way. The letter further stated that Narragansett would make FAF payments to TransCanada consistent with the Blackstone and Newport tariffs that the Rhode Island Commission had approved prior to the merger, and Eastern's approved tariffs in Massachusetts. It attached a Fuel Adjustment schedule consistent with that set forth in Blackstone's and Newport's retail standard offer service tariffs; that is, for each year from 2000 through 2004. Narragansett sent this letter to TransCanada in draft form and asked that TransCanada review it.

17. TransCanada and Narragansett's representative discussed the letter. After receiving no objection from TransCanada, on April 18, 2000, Narragansett's representative put the draft letter in final form and sent it to TransCanada.

18. In June of 2000, in a public proceeding before the Rhode Island Commission concerning Narragansett's proposed retail standard offer service rates, Narragansett stated, on the record, that the FAF for the former Blackstone and Newport wholesale standard offer service agreements ("EUA Zone wholesale standard offer service agreements") would end after 2004. Docket No. 3138. These agreements included the WSOS Agreement.

19. On May 28, 2003, in a public hearing before the Rhode Island Commission regarding Narragansett's retail standard offer service rates, Narragansett told the Rhode Island Commission that it was not obligated to make FAF payments under the EUA Zone wholesale standard offer service agreements (which included the WSOS Agreement) after 2004. Docket No. 3508.

20. In November of 2003, Narragansett made a filing with the Rhode Island Commission which included a forecast that reflected zero FAF payments under the EUA Zone wholesale standard offer service agreements after 2004. Docket No. 3571.

21. On July 1, 2004, Narragansett filed an application with the Rhode Island Commission to set its standard offer service rates effective as of October 1, 2004 based upon Narragansett's actual costs incurred through May 2004 and its estimated costs from June 1, 2004 through December 31, 2005. Consistent with the retail standard offer service tariffs that the Rhode Island Commission had approved for Blackstone and Newport, the FAF payments that Narragansett informed TransCanada it would continue to make upon the merger, and Narragansett's public statements to the Rhode Island Commission, this filing showed that Narragansett's proposed retail standard offer service rates did not include an amount for an FAF to be paid under the EUA Zone wholesale

standard offer service agreements (which include TransCanada under the WSOS Agreement).

22. The Rhode Island Commission approved Narragansett's standard offer service rates effective August 1, 2004 pursuant to an Open Meeting decision on July 26, 2004 and a written Order dated August 26, 2004. Order No. 17972, Docket No. 3571. The approved rates did not include an amount for an FAF to be paid under the EUA Zone wholesale standard offer service agreements beyond December 31, 2004.

23. Likewise, on November 10, 2004, Narragansett made another filing relating to retail standard offer service. This filing was also publicly noticed. A Bench Decision at a public hearing on December 13, 2004, which was confirmed by a written Order issued February 17, 2005, approved Narragansett's filing which was based on no FAF payments in relation to the EUA Zone wholesale standard offer service agreements (which include the WSOS Agreement).

24. Consistent with the foregoing, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.

25. Narragansett at all times provided public notice of its filings and hearing dates in accordance with the rules and regulations of the Rhode Island Commission. All members of the public, including suppliers, are invited to participate through the public comment process at the Commission. Orders of the Rhode Island Commission are publicly available. In recent years, all of Narragansett's rate filings are posted on the Rhode Island Commission's website prior to the hearings, as are all Rhode Island Commission orders shortly after their issuance.

26. On information and belief, TransCanada monitors these proceedings closely, but has never filed testimony or otherwise commented to the Rhode Island Commission or Narragansett (or its affiliates) as to whether Narragansett should request the Commission to approve an FAF after 2004.

27. On March 1, 2005, TransCanada sent a letter to Narragansett (a) claiming that Narragansett was in default of the WSOS Agreement by not providing for an FAF in its calculations; (b) asserting that Narragansett was in breach by its "[refusal] to comply with its obligations under Article V before the Rhode Island Public Utilities Commission with respect to its Standard Offer Service tariffs"; and (c) threatening to terminate the WSOS Agreement.

28. TransCanada's reference to Narragansett's lack of inclusion of an FAF in its calculations apparently refers to the calculations Narragansett performs prior to issuing payment. Narragansett's calculation was accurate because TransCanada was not entitled to a payment for an FAF: the retail standard offer service rates did not include a Fuel Adjustment in relation to the WSOS Agreement.

29. TransCanada's assertion regarding obligations under Article V (sic) appears to imply that Narragansett had an affirmative obligation to take an action before the Rhode Island Commission; however, the WSOS Agreement contains no such obligation.

30. TransCanada's threat to terminate the WSOS Agreement is without cause and would itself constitute a breach of the WSOS Agreement.

31. At no point prior to March 1, 2005 did TransCanada provide Narragansett with a written notice of a dispute as required by the WSOS Agreement. The WSOS

Agreement states: "If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date." WSOS Agreement, Art. 6, at 6.

32. TransCanada's purported notice of default was and is baseless and was accompanied by threats to terminate the Agreement. Its action was a pretext to enable TransCanada to avoid performing a contract that was no longer economically advantageous to TransCanada, whether or not fuel payments were made.

33. A termination by TransCanada of the WSOS Agreement would not be justified, and would constitute a material breach; however, in order to preserve the benefit of the WSOS Agreement for its customers, and to deny TransCanada its pretextual argument for termination, Narragansett has paid to TransCanada, under protest, and with a full reservation of rights, a total of $921,827.46. The payments were based upon a calculation using the FAF that had been approved by the Rhode Island Commission for recovery in rates through, but not after, December 31, 2004. The payments relate to the period of January 1 through March 31, 2005.

34. TransCanada had knowledge and notice of Narragansett's intention not to seek Commission approval for recovery of FAF payments from its customers after 2004, and it never objected at any point in time prior to early 2005. TransCanada's subsequent threat to terminate the WSOS Agreement constitutes an attempt to extort payments from Narragansett that are not due under the WSOS Agreement.

## COUNT I
## (BREACH OF CONTRACT)

35. Narragansett repeats and realleges paragraphs 1 through 34 as stated above.

36. TransCanada has demanded FAF payments from Narragansett to which it is not entitled under the WSOS Agreement, and has threatened to terminate the WSOS Agreement without cause, in order to avoid performing an agreement that is no longer economically advantageous to TransCanada, with or without FAF payments.

COUNT II
(DECLARATORY JUDGMENT)

37. Narragansett repeats and realleges paragraphs 1 through 36 as stated above.

38. TransCanada has threatened to terminate the WSOS Agreement even though TransCanada has no right to do so and no right to an FAF after 2004. Therefore, an actual controversy exists as to whether TransCanada has a right to terminate the WSOS Agreement.

COUNT III
(BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

39. Narragansett repeats and realleges paragraphs 1 through 38 as stated above.

40. TransCanada has breached its obligation of good faith and fair dealing by: (a) failing to object at any point in time prior to March of 2005 to Narragansett's stated intention to not provide in rates for collection of FAF payments from customers after 2004; (b) notifying Narragansett for the first time in early 2005 of TransCanada's expectation that Narragansett had an obligation to take an action before the Rhode Island Commission and its expectation that Narragansett was required to make such payments even absent approval to collect such costs in rates; and (c) threatening to terminate the

WSOS Agreement as a pretext in order to avoid a contract that had become economically disadvantageous to TransCanada even with fuel payments.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff The Narragansett Electric Company seeks judgment as follows;

1. Compensatory damages for all damages caused by TransCanada's breach of contract, plus interest and costs;

2. A declaration that TransCanada has breached its obligation of good faith and fair dealing;

3. A declaration, pursuant to R.I. Gen. Laws § 9-30-2, that TransCanada does not have a right to terminate the WSOS Agreement; and

5. Such other relief as the Court deems just and proper under the circumstances.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

NARRAGANSETT ELECTRIC COMPANY

By its Attorney,

Gerald J. Petros, Esq. (#2931)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (FAX)

DATED: May 26, 2005.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

TRANSCANADA POWER MARKETING LTD.

Plaintiff,

v.

NARRAGANSETT ELECTRIC COMPANY

Defendant,

C.A. No. 05-40076

RECEIPT # 404571
AMOUNT $ 250.00
SUMMONS ISSUED ✓
LOCAL RULE 4.1 ✓
WAIVER FORM ✓
MCF ISSUED ✓
BY DPTY. CLK. S Jones
DATE 5/17/05

COMPLAINT

Plaintiff TransCanada Power Marketing, Ltd. ("TransCanada") brings this action against Narragansett Electric Company ("Narragansett") for breach of contract, contractual indemnity, breach of the implied covenant of good faith and fair dealing, and for a declaratory judgment.

PARTIES

1. Plaintiff TransCanada is a Delaware corporation with a principal place of business at 11 Turnpike Road, Westborough, Massachusetts. TransCanada is a power marketing company that purchases electricity from generation sources, such as power plants, and resells that electricity to retail electric distribution companies and other customers throughout the northeastern United States.

2. Defendant Narragansett is a Rhode Island corporation with a principal place of business at 280 Melrose Street, Providence, Rhode Island. Narragansett is a retail electric distribution company engaged in the transmission and distribution of electricity to retail end-customers in Rhode Island. Narragansett's predecessors include two retail electric distribution

companies in Rhode Island formerly known as Blackstone Valley Electric Company ("Blackstone") and Newport Electric Company ("Newport"), both of which merged into Narragansett in 2000.

## JURISDICTION AND VENUE

3. This Court has jurisdiction under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000. Venue is proper in this Court under 28 U.S.C. § 1391(a)(1), (2) and (3).

## FACTS

### Industry Background: The URA

4. In 1996, Rhode Island passed a Utility Restructuring Act (the "URA"). The general objective of the URA was to deregulate electric power supply and develop a competitive retail market for electricity in Rhode Island. During the same time period, a similar electricity deregulation process was ongoing in Massachusetts.

5. The URA required that electric distribution companies in Rhode Island divest ownership of their electricity generation facilities, and offer so-called "Retail Access" to Rhode Island retail customers. R.I.G.L. 39-1-27.3 (1997). As envisioned by the URA, Retail Access required each retail electric distribution company to allow its customers to purchase electricity from non-affiliated retail suppliers, and further required each retail distribution company to transport that purchased electricity over the retail distribution company's own lines from the alternative supplier to the customer.

6. The URA also required that, during the transition to Retail Access, the retail distribution companies provide a standard power supply (a "Standard Offer Service") to Rhode Island retail customers through 2009, at a set of regulated prices. R.I.G.L. 39-1-27.3(d) (1997). The purpose of the Standard Offer Service was to provide Rhode Island retail customers a stable,

competitively-priced source of electricity during the transition period to a competitive Retail Access market, for those customers that had not yet obtained an alternative electricity supplier.

7. Under the URA, the Standard Offer Service was to be priced to account for increases in the consumer price index, and also for other factors reasonably beyond the control of power suppliers such as "extraordinary fuel costs." R.I.G.L. 39-1-27.3(d) (1997). The URA required the retail distribution companies to file tariffs with the Rhode Island Public Utilities Commission ("PUC") to implement Standard Offer Service through 2009, for the benefit of both wholesale and retail customers and their suppliers. R.I.G.L. 39-1-27(a) (1997).

<u>Implementation of the URA</u>

8. Blackstone and Newport were retail electric distribution companies in Rhode Island at the time of enactment of the URA, and were wholly-owned subsidiaries of Eastern Utilities Associates ("EUA"), a public utility holding company. EUA also owned a retail electric company in Massachusetts, Eastern Edison Company ("Eastern," and, collectively with Blackstone and Newport, the EUA retail "Companies").

9 At the time of enactment of the URA, the EUA Companies purchased their electricity, which they then supplied to their retail customers, from an affiliated wholesale electricity supplier, Montaup Electric Company ("Montaup"). To comply with the URA (and a Massachusetts counterpart), the Companies were required to terminate their wholesale supply contracts with Montaup, and allow their retail customers to have Retail Access to alternative suppliers; Montaup was also required to divest its generation facilities.

10. On October 17, 1997, in order to implement the URA, Blackstone, Newport, and Montaup entered into a Stipulation and Agreement with the PUC, as well as the Rhode Island Division of Public Utilities and Carriers ("Division") (hereinafter, the "RI Settlement

Agreement"). The RI Settlement Agreement was approved by the Federal Energy Regulatory Commission ("FERC"). A similar Stipulation and Agreement was executed in Massachusetts and also approved by FERC (the "MA Settlement Agreement," and, collectively with the RI Settlement Agreement, the "Settlement Agreements").

11. In order to ensure a steady supply of Standard Offer Service, Montaup was required under the RI Settlement Agreement to provide Blackstone and Newport with a guaranteed, "Backstop" supply of Standard Offer Service through the required term of Standard Offer Service in Rhode Island (through 2009).[1] Blackstone and Newport were in turn required to seek alternative wholesale suppliers for Standard Offer Service during that term, and Montaup was to be released from its Backstop obligation to the extent Blackstone and Newport were able to obtain replacement contracts. In order to ensure a Standard Offer Service to Rhode Island retail customers through 2009, however, Montaup's Backstop obligation required it to provide Standard Offer Service to Blackstone and Newport through 2009 to the extent those companies did not obtain alternative wholesale Standard Offer Service supply contracts.

12. The RI Settlement Agreement required that Montaup assign to the purchaser of any divested Montaup generation asset a commensurate share of Montaup's Backstop obligation. Thus, any purchaser of Montaup's generation assets was required to assume a share of Montaup's Backstop Standard Offer Service obligations to Blackstone and Newport.

13. Consistent with the pricing scheme for Standard Offer Service set forth in the URA, the RI Settlement Agreement provided that Montaup and its successors and assigns were to provide Standard Offer Service to Blackstone and Newport in exchange for a stipulated set of base prices rising over time, subject to a "fuel index" to account for future extraordinary fuel

[1] Massachusetts required electric distribution companies to provide standard offer service only through 2004, and hence the MA Settlement Agreement imposed upon Montaup a Backstop obligation in Massachusetts only through 2004.

costs, through 2009. The purpose of the fuel index, as envisioned by the URA and Settlement Agreements, was to ensure that wholesale Standard Offer Service suppliers would be protected against the downside risk of future extraordinary increases in fuel costs, so that they would be able to agree to the desired long-term Standard Offer Service supply contracts for the benefit of Rhode Island retail customers.

<u>TransCanada's WSOS Agreement</u>

14. On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement whereby TransCanada purchased certain electricity generation assets of Montaup (the "Asset Purchase Agreement"). TransCanada was thereby also required by the RI and MA Settlement Agreements to assume a percentage share of Montaup's Backstop obligation to provide Standard Offer Service to Blackstone, Newport and Eastern.

15. TransCanada and Blackstone, Newport and Eastern (collectively, the EUA "Companies") therefore entered into a Wholesale Standard Offer Service Agreement dated April 7, 1998 (the "WSOS Agreement," or "Agreement," attached hereto as Exhibit A), which is governed by Massachusetts law. In the WSOS Agreement, TransCanada agreed to assume a percentage share of Montaup's Standard Offer Service obligations under the Settlement Agreements, to Blackstone and Newport through 2009 (the term of the Standard Offer Service in Rhode Island); and to Eastern through 2004 (the term of the Standard Offer Service in Massachusetts). (*See* Agreement, § 3 & App. A.)

16. Under the WSOS Agreement, and as specified in the Settlement Agreements and the URA, TransCanada was to receive a price for delivering Standard Offer Service consisting of the stipulated set of base prices rising over time (the "Standard Offer Wholesale Price"), plus a fuel index (the "Fuel Adjustment Factor") to account for future extraordinary fuel costs. Under

the WSOS Agreement, the Fuel Adjustment Factor was to be calculated based upon the tariffs that Blackstone and Newport were required to file in accordance with the URA and Settlement Agreements. Specifically, Agreement Article Five provides that:

> For each kilowatt-hour of Delivered Energy that Supplier [TransCanada] provides in each month…, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:
>
> Price = Standard Offer Wholesale Price + Fuel Adjustment Factor
>
> Where: Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and
>
> Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collection, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service Tariffs. … The Retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent the Companies are allowed to collect such revenues from the retail customers taking Standard Offer Service.

17. The Agreement imposed upon Blackstone and Newport a good faith obligation to make the required Standard Offer Service Tariff filings, and to use reasonable efforts to obtain regulatory approval for a Fuel Adjustment Factor to be paid to TransCanada over the 2009 term of the Agreement.

18. The Agreement provided TransCanada with indemnity and termination rights in the event that any government or regulatory agency amended the Standard Offer Service in a manner which materially increased TransCanada's obligations or costs to provide Standard Offer Service under the Agreement. Specifically, Article 8.3 of the Agreement provides:

> In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases the Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse the Supplier for any costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes. … In the

> event that the Parties are not able to agree on ... the amount to be reimbursed, ... either Party may terminate this Agreement on sixty (60) days written notice ....

19. The Agreement also provided TransCanada with termination rights, and damages rights, in the event that the Companies failed to perform any of their obligations under the Agreement. Specifically, the Agreement provides that, upon an uncured default by any of the Companies, TransCanada has the right to recover direct damages resulting from the default; to pursue all other remedies and damages provided for by law; and to terminate the Agreement upon sixty (60) days notice. (Agreement, § 7(1), (2).) Finally, the Agreement provides that TransCanada is entitled to recover interest on any improperly withheld payments. (*Id.* § 6.)

<u>The Narragansett Merger</u>

20. From the signing of the Agreement in April 1998 through early 2000, Blackstone and Newport filed the required Standard Offer Service Tariffs with the PUC on a periodic basis. Blackstone and Newport thereby obtained approval of the Standard Offer Wholesale Prices and a Fuel Adjustment Factor for 1999 and 2000, as required by the Agreement.

21. In 2000, Blackstone and Newport merged into Narragansett, another retail electric distribution company in Rhode Island. At the same time, Eastern merged into Massachusetts Electric Company ("Mass. Electric"), another retail distribution company in Massachusetts.

22. Narragansett and Mass. Electric were at the time (and still are, upon information and belief) wholly-owned subsidiaries of National Grid USA ("National Grid"). Through the comprehensive merger, all of EUA's former retail distribution companies in Rhode Island and Massachusetts, consisting of Blackstone, Newport, and Eastern, merged into the corresponding Rhode Island and Massachusetts retail distribution companies of National Grid, consisting of Narragansett and Mass. Electric.

23. By way of the Rhode Island portion of the merger, Narragansett became the retail electric distribution company both for the previous retail customers of Blackstone and Newport in Rhode Island (hereinafter the former "EUA Zone"), as well as its own previous retail customers in its former area (hereinafter the old "Narragansett Zone").

24. The PUC approved the Narragansett merger in March, 2000. At the request of Narragansett, the PUC cancelled the former Blackstone and Newport Standard Offer Service Tariffs and ruled that Narragansett could continue to obtain payment for Standard Offer Service in both its new EUA Zone and in its old Narragansett Zone through Narragansett's own and future Standard Offer Service Tariffs and related filings.[2]

Narragansett's Wrongful Conduct

25. On April 18, 2000, Narragansett sent a letter to TransCanada giving notice of the merger, and stating that Narragansett would succeed to and assume the obligations of Blackstone and Newport under the WSOS Agreement. The letter further assured TransCanada, as required for valid assignment of the Agreement in the case of a merger, that the obligations of the parties "are not affected by the merger and assignments." Narragansett's letter further stated that Narragansett would continue to make Fuel Adjustment payments to TransCanada "after 1999," according to the mechanism previously established in the RI Settlement Agreement and in the Blackstone and Newport Standard Offer Service Tariffs.

26. Unbeknownst to TransCanada, however, Narragansett began planning even at the time of the merger to deny TransCanada the Fuel Adjustment Factor it had bargained for in the

---

[2] Narragansett, like Blackstone and Newport, had entered into its own Settlement Agreement with the PUC in 1997, which also required Retail Access and divestiture of generation assets. Narragansett's Settlement Agreement required Narragansett to provide Standard Offer Service at the same set of stipulated prices and fuel adjustment triggers as in Blackstone's and Newport's RI Settlement Agreement. Like Blackstone and Newport, Narragansett also subsequently entered into Standard Offer Service supply contracts with a number of wholesale Standard Offer Service suppliers. Narragansett was required, like Blackstone and Newport, to file tariffs under the URA to implement the Standard Offer Service for the benefit of its customers and suppliers.

WSOS Agreement. It was to Narragansett's benefit not to pay a Fuel Adjustment Factor, particularly in times of rising fuel prices, in order to reduce its overall expenses and costs. Fuel prices began rising at the time of Narragansett's merger, and the Fuel Adjustment Factors in Narragansett's and Blackstone's and Newport's wholesale Standard Offer Service supply contracts had been triggered.

27. Nevertheless, Narragansett thereafter and through the end of 2004 continued to pay TransCanada for Standard Offer Service as required under the Agreement, including both the base Wholesale Standard Offer Price and a Fuel Adjustment Factor. Fuel prices continued to rise, however, and Fuel Adjustment Factor payments to TransCanada and other wholesale Standard Offer Service suppliers became a regular component of the price paid by Narragansett to its suppliers for Wholesale Standard Offer Services.

28. In May, 2003, unbeknownst to TransCanada, Narragansett began to argue affirmatively before the PUC that its suppliers in the former EUA Zone should not be paid a Fuel Adjustment Factor after 2004. The PUC expressed concern about Narragansett's position, and Narragansett stated to the PUC both that it had discussed its intended position with all of its EUA Zone suppliers and that, while the suppliers had not affirmatively agreed with Narragansett's position, none of those suppliers had raised objection. These were blatant misrepresentations, as Narragansett neither notified nor discussed with TransCanada at any time Narragansett's intention not to provide Fuel Adjustment Factor payments under the Agreement after 2004.

29. In July 2004, Narragansett again told the PUC that it should make no provision for a Fuel Adjustment Factor in the former EUA Zone after 2004. The PUC again expressed concern, both about the merit of Narragansett's position and about whether Narragansett's EUA Zone suppliers had been notified and agreed with Narragansett's position. In response,

Narragansett argued against TransCanada's right to a Fuel Adjustment Factor, and again misrepresented both that it had discussed the matter with all of its EUA Zone suppliers and that none of those suppliers had affirmatively disputed Narragansett's position. Narragansett also falsely assured the PUC that, in the event a dispute developed, TransCanada had no ability to terminate the WSOS Agreement in the event that it failed to receive Fuel Adjustment Factor payments after 2004.

30. In December, 2004, Narragansett filed with the PUC its proposed Standard Offer Service Tariffs and rates for 2005. Narragansett specified that no Fuel Adjustment Factor should be granted to TransCanada (or any other EUA Zone suppliers) in 2005. As a result of that filing, and Narragansett's arguments and previous misstatements to the PUC, the PUC approved Standard Offer Service Tariffs and rates for 2005 that provide no allocation for a Fuel Adjustment Factor for TransCanada.[3] At the same time, Narragansett continued to request and obtain approval for a Fuel Adjustment Factor in 2005 for its suppliers in the old Narragansett Zone. TransCanada was never made aware of any of Narragansett's filings or arguments at the PUC in 2003 and 2004.

31. In February, 2005, TransCanada learned for the first time that Narragansett did not plan to pay TransCanada any Fuel Adjustment Factor after 2004, or indeed for the last five years of the WSOS Agreement. TransCanada discovered this position only after receiving Narragansett's calculation of the amount payable for Standard Offer Service delivered in January, 2005, which noticeably omitted any payment for a Fuel Adjustment Factor. The expected amount of that unpaid Fuel Adjustment Factor, just for January, 2005, totaled over

[3] When asked in December 2004 whether it had had further discussions with its EUA Zone suppliers since its previous statements, Narragansett admitted in a half-truth at that point that it had not had *recent* discussions with all of its suppliers.

$320,000.00. The Fuel Adjustment Factor each subsequent month has been similar, and is expected to remain substantial in future months.

32. On March 1, 2005, TransCanada provided written notice of default under the WSOS Agreement. Narragansett has thereafter refused to cure or change its position, or to indemnify or reimburse TransCanada under Article 8(3) of the Agreement for loss of the Fuel Adjustment Factor.

33. Narragansett also continues to dispute TransCanada's right to terminate the WSOS Agreement. Narragansett has further threatened that its National Grid affiliates will withhold payments owed to TransCanada under the Asset Purchase Agreement if TransCanada proceeds to terminate the WSOS Agreement.

34. Narragansett's breaches of its obligations under the WSOS Agreement have deprived TransCanada of its contractual rights to payment of a Fuel Adjustment Factor under the Agreement. These breaches have caused and are continuing to cause TransCanada substantial and ongoing damages.

<u>Count I</u>
(Breach of Contract)

35. TransCanada repeats and incorporates by reference paragraphs 1 through 34 above.

36. Narragansett has breached the WSOS Agreement through the acts described above, including (a) its failure to file for or make a reasonable effort to obtain regulatory approval of a Fuel Adjustment Factor after 2004, (b) its failure to pay a Fuel Adjustment Factor to TransCanada as required under the Agreement; and (c) its failure to indemnify or reimburse TransCanada as required by Article 8(3) of the Agreement for regulatory loss of the Fuel Adjustment Factor.

37. As a result of these breaches, TransCanada has suffered and will continue to suffer monetary damages. TransCanada is entitled to terminate the Agreement, and to an award of its damages and interest.

Count II
(Contractual Indemnification)

38. TransCanada repeats and incorporates by reference paragraphs 1 though 37 above.

39. The PUC's abolishment of the Blackstone and Newport tariffs, and its subsequent approval of Standard Offer Service Tariffs for 2005 that do not include a Fuel Adjustment Factor in the EUA Zone, have amended the Standard Offer Service in a manner that has materially increased TransCanada's costs and obligations to provide Standard Offer Service under the Agreement. These regulatory changes were made by the PUC at the express request of Narragansett.

40. Under Article 8(3) of the WSOS Agreement, Narragansett is obligated to indemnify or otherwise reimburse TransCanada for loss of the expected Fuel Adjustment Factor.

Count III
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

41. TransCanada repeats and incorporates by reference paragraphs 1 through 40 above.

42. The Agreement contains an implied covenant of good faith and fair dealing.

43. Narragansett has breached the covenant of good faith and fair dealing implied in the Agreement through its conduct described above, including but not limited to its various contractual breaches, its misleading behavior with TransCanada and the PUC, its concealment of

its planned breach of the Agreement, and its expropriation to its own benefit of TransCanada's rights under the Agreement.

44. As a result of these breaches, TransCanada has suffered and will continue to suffer substantial monetary damages. TransCanada is entitled to terminate the Agreement, and to an award of damages and interest.

Count IV
(Declaratory Relief under G.L. c 231A: Right to Terminate)

45. TransCanada repeats and incorporates by reference paragraphs 1 through 44 above.

46. An actual controversy exists as to whether Narragansett has breached the WSOS Agreement, and whether TransCanada has the right to terminate the Agreement, including under its Articles 7(2) and/or 8(3).

47. TransCanada requests a declaratory judgment that Narragansett has breached the terms of the WSOS Agreement; that Narragansett has failed to cure the breach; and that TransCanada has the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOS Agreement immediately.

WHEREFORE, TransCanada requests the following relief:

1. Judgment in its favor on all counts.

2. An award of damages, including interest, in an amount to be determined at trial.

3. A declaratory judgment that Narragansett has breached the terms of the WSOS Agreement; that Narragansett has failed to cure the breach; and that TransCanada has the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOS Agreement immediately.

4. An award of its costs, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

TRANSCANADA POWER MARKETING

By its attorneys,

Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, MA 02109
Telephone No. (617) 248-5000
Fax No. (617) 248-4000