# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

Civil Action No. 05-40076FDS

TRANSCANADA POWER MARKETING LTD. )
Plaintiff, )
v. )
THE NARRAGANSETT ELECTRIC COMPANY )
Defendant. )

**ANSWER AND COUNTERCLAIM OF THE NARRAGANSETT ELECTRIC COMPANY TO COMPLAINT OF TRANSCANADA POWER MARKETING LTD. DEMAND FOR JURY TRIAL**

Defendant, The Narragansett Electric Company ("Narragansett"), hereby responds to the numbered paragraphs of the Complaint of TransCanada Power Marketing Ltd. ("TransCanada") as follows:

PARTIES

1. Narragansett admits that TransCanada is a Delaware corporation, but states that TransCanada's principal place of business is located at 110 Turnpike Road, Westborough, Massachusetts. Narragansett further admits that TransCanada is a power marketing company that sells electricity to at least one retail electric distribution company but is without knowledge or information concerning the sources from which TransCanada purchases electricity or the scope of TransCanada's customer base.

2. The allegations of paragraph 2 are admitted, except the name of "Newport" is "Newport Electric Corporation."

JURISDICTION AND VENUE

3. Narragansett admits that this Court has jurisdiction under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000. However, Narragansett denies that venue is proper in this Court.

FACTS

Industry Background: The URA

4. Narragansett admits that Rhode Island passed a Utility Restructuring Act in 1996. The URA speaks for itself and, therefore, the characterization of it is denied. Narragansett further admits that an electricity deregulation process was ongoing in Massachusetts in or about 1996.

5. The URA speaks for itself and, therefore, TransCanada's characterization of it is denied.

6. The URA speaks for itself and, therefore, TransCanada's characterization of it is denied.

7. The URA speaks for itself and, therefore, TransCanada's characterization of it is denied.

Implementation of the URA

8. The allegations of paragraph 8 are admitted.

9. The allegations of the first sentence of paragraph 9 are admitted. The remaining allegations of paragraph 9 are denied.

10. The allegations of paragraph 10 are admitted.

11. The RI Settlement Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied.

12. The RI Settlement Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied.

13. The URA and RI Settlement Agreements speak for themselves and, therefore, TransCanada's characterization of them is denied. Further answering, Narragansett specifically denies that the "fuel index" described in paragraph 13 was applicable through 2009.

TransCanada's WSOS Agreement

14. Narragansett admits that TransCanada and Montaup entered into an Asset Purchase Agreement on April 7, 1998. The Asset Purchase Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied.

15. Narragansett admits that TransCanada and Blackstone, Newport and Eastern (collectively, the "EUA Companies") entered into a Wholesale Standard Offer Service ("WSOS") Agreement dated April 7, 1998. The WSOS Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied.

16. The WSOS Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied. Further answering, Narragansett specifically denies that it was obliged to file Fuel Adjustment Factor tariffs.

17. The WSOS Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied. Further answering, Narragansett specifically denies that it was required to make a filing or use efforts to obtain regulatory approval for a Fuel Adjustment Factor to be paid to TransCanada after 2004.

18. The WSOS Agreement speaks for itself and TransCanada's characterization of that Agreement is denied.

19. The WSOS Agreement speaks for itself and TransCanada's characterization of that Agreement is denied.

The Narragansett Merger

20. The allegations of paragraph 20 are admitted, except, Narragansett denies that a Fuel Adjustment Factor was approved for the year 1999.

21. The allegations of paragraph 21 are admitted.

22. The allegations of paragraph 22 are admitted.

23. The allegations of paragraph 23 are admitted.

24. Narragansett admits that the PUC approved the merger in March 2000. The PUC's ruling speaks for itself and, therefore, the remaining allegations of paragraph 24 are denied. Further answering, Narragansett admits that it had entered into a Settlement Agreement with the PUC in 1997. Narragansett's Settlement Agreement with the PUC speaks for itself and, therefore, the characterizations of that Agreement in footnote 2 are denied. Narragansett specifically denies that the Narragansett Settlement Agreement required Narragansett to provide Standard Offer Service at the same set of fuel adjustment triggers as Blackstone and Newport's RI Settlement Agreement.

Narragansett's [Alleged] Wrongful Conduct

25. Narragansett admits that it sent TransCanada a letter on April 18, 2000. The letter speaks for itself and, therefore, TransCanada's characterization of it is denied. Further answering, Narragansett states that the letter, including its attachments, makes it clear that Fuel Adjustments, where applicable, would only be available through 2004.

26. The allegations of paragraph 26 are denied.

27. The allegations of the first sentence of paragraph 27 are admitted. Narragansett denies the remaining allegations of paragraph 27.



{J:\CLIENTS\lit\304810\0001\00547646.DOC;1}

28. The allegations of paragraph 28 are denied.

29. The allegations of paragraph 29 are denied.

30. The first sentence of paragraph 30 is admitted. The remaining allegations of paragraph 30 are denied.

31. The allegations of paragraph 31 are denied.

32. The allegations of paragraph 32 are denied. Further answering, Narragansett states that it has no obligation to cure, change its position, or indemnify or reimburse TransCanada and that no claim for reimbursement under Article 8(3) of the WSOS Agreement has ever been made by TransCanada.

33. Narragansett admits that it disputes TransCanada's right to terminate the WSOS Agreement. The remaining allegations of paragraph 33 are denied.

34. The allegations of paragraph 34 are denied.

Count I

(Breach of Contract)

35. Narragansett repeats and incorporates by reference its responses to paragraphs 1 through 34 above.

36. The allegations of paragraph 36 are denied.

37. The allegations of paragraph 37 are denied.

Count II

(Contractual Indemnification)

38. Narragansett repeats and incorporates by reference its responses to paragraphs 1 through 37 above.

39. The allegations of paragraph 39 are denied.

40. The allegations of paragraph 40 are denied.

Count III

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

41. Narragansett repeats and incorporates by reference its responses to paragraphs 1 through 40 above.

42. The allegations of paragraph 42 are admitted.

43. The allegations of paragraph 43 are denied.

44. The allegations of paragraph 44 are denied.

Count IV

(Declaratory Relief under G.L. c 231A: Right to Terminate)

45. Narragansett repeats and incorporates by reference its responses to paragraphs 1 through 44 above.

46. The allegations of paragraph 46 are admitted.

47. Narragansett denies that TransCanada has a right to the declaratory judgment that it seeks.

AFFIRMATIVE DEFENSES

FIRST AFFIRMATIVE DEFENSE

Venue does not properly lie in the United States District Court for the District of Massachusetts.

SECOND AFFIRMATIVE DEFENSE

The Complaint fails to state a claim for Breach of Contract, Contractual Indemnification or Breach of the Implied Covenant/Good Faith and Fair Dealing because the documents relied upon to support these claims do not establish an obligation to pay or seek approval of a Fuel Adjustment Factor after 2004, or to indemnify or reimburse TransCanada under Section 8(3).

THIRD AFFIRMATIVE DEFENSE

TransCanada has waived its claim for damages arising from Narragansett's failure to pay a Fuel Adjustment Factor after 2004 by failing to contest Narragansett's 2004 filings before, or orders of, the Rhode Island Public Utility Commission regarding the Fuel Adjustment Factor, which did not include an amount to be paid for a Fuel Adjustment Factor.

FOURTH AFFIRMATIVE DEFENSE

TransCanada's claims are barred in whole or in part by its own inequitable conduct and unclean hands and by its breaches of its obligations of good faith and fair dealing.

FIFTH AFFIRMATIVE DEFENSE

TransCanada's claims are barred in whole or in part by its own breaches of its contractual obligations to Narragansett.

COUNTERCLAIM OF THE NARRAGANSETT ELECTRIC COMPANY

PARTIES AND JURISDICTION

1. Plaintiff-in-Counterclaim, The Narragansett Electric Company ("Narragansett"), is a Rhode Island corporation with its principal place of business at 280 Melrose Street, Providence, Rhode Island.

2. Defendant-in-Counterclaim, TransCanada Power Marketing Ltd. ("TransCanada"), is a Delaware corporation with its principal place of business at 110 Turnpike Road, Westborough, Massachusetts.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000, exclusive of interest and costs, and Narragansett and TransCanada are citizens of different states.

FACTS COMMON TO ALL COUNTS

4. Narragansett is a retail electric distribution company that supplies and delivers electricity to 465,000 retail end-use customers in 38 communities in Rhode Island. Narragansett provides such service pursuant to retail tariffs, and at rates and under terms and conditions that the Rhode Island Public Utilities Commission (the "Rhode Island Commission") approves and regulates.

5. TransCanada is a power marketing company that sells electricity at wholesale to Narragansett.

6. Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") were retail electric supply and distribution companies in Rhode Island, and were wholly-owned subsidiaries of the Eastern Utilities Associates ("EUA"), a public utility holding company. EUA also owned Eastern Edison Company ("Eastern"), a retail electric supply and distribution company in Massachusetts, and Montaup Electric Company ("Montaup"), an affiliate of, and wholesale electricity supplier to, Blackstone, Newport and Eastern.

7. The Rhode Island Commission and the Rhode Island Division of Public Utilities and Carriers possess the exclusive power and authority to supervise, regulate, and issue orders governing the conduct of companies that provide energy to the public. They safeguard the public against improper and unreasonable rates and charges by providing full, fair, and adequate administrative procedures and remedies, and by securing a judicial review to any party aggrieved by such an administrative proceeding or ruling. R.I. Gen. Laws § 39-1-1(c).

8. On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement. Pursuant to the Asset Purchase Agreement, TransCanada bought certain electricity

generation assets of Montaup, namely, a power purchase agreement ("PPA") between Montaup and the Ocean State Power generation station located in Burrillville, Rhode Island. The purchase was effectuated through a PPA Transfer Agreement. Also under the Asset Purchase Agreement, TransCanada agreed to provide to Blackstone, Newport and Eastern a specific percentage share of electric service that they needed to satisfy their electric supply obligations to their retail standard offer service customers. The supply obligation was effectuated through a Wholesale Standard Offer Service Agreement ("WSOS Agreement") with Blackstone, Newport, and Eastern.

9. Under the WSOS Agreement, Blackstone, Newport and Eastern are to pay to TransCanada a "Standard Offer Wholesale Price," which is defined as "the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy" as set forth in an appendix to the WSOS Agreement. WSOS Agreement, Art. 1, at 3; Appendix A, at 16. The schedule of prices rises over time and more than doubles during the ten-year term of the WSOS Agreement.

10. The WSOS Agreement also provides for the payment of a Fuel Adjustment Factor ("FAF") upon the occurrence and satisfaction a specific condition precedent. The FAF is defined as:

> "... a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. *The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.*"

WSOS Agreement, Art. 5, at 5-6 (emphasis added).

11. The WSOS Agreement clearly spells out in the FAF clause that the FAF is only payable to TransCanada upon the occurrence of the Rhode Island Commission issuing a very specific approval for Blackstone's and Newport's retail tariffs, which govern the rates, terms and conditions of service to their standard offer service customers; namely, the inclusion of a Fuel Adjustment in the retail rates which allows Blackstone and Newport to collect an FAF payment from their retail customers who take service pursuant to the standard offer service tariff.

12. Blackstone's and Newport's Rhode Island Commission-approved retail standard offer service tariffs did not contain a Fuel Adjustment for 1998 and 1999 and did contain a Fuel Adjustment for each year from 2000 through 2004.

13. Effective May 1, 2000, Blackstone and Newport merged with and into Narragansett, and Eastern Edison merged with and into Massachusetts Electric Company ("Massachusetts Electric"), a retail electric distribution company in Massachusetts. Narragansett and Massachusetts Electric are wholly owned by National Grid USA ("National Grid"), a public utility holding company.

14. Pursuant to the terms of the WSOS Agreement, TransCanada's and Massachusetts Electric's (as successor to Eastern) obligations that relate to service to Massachusetts Electric expired as of December 31, 2004. Accordingly, the only issues in controversy are those that arise in relation to service in Rhode Island and retail rates as approved by the Rhode Island Commission.

15. The Rhode Island Commission approved the Narragansett-Blackstone and Newport merger (as well as the merger of their affiliates) in March of 2000 along with a rate settlement for the newly-merged entity and its customers. Order No. 16200, approving Third

Amended Stipulation and Settlement, March 24, 2000, Docket 2930. As a result, Narragansett became the retail electric supplier and distribution company for Blackstone and Newport's previous customers, in addition to its own existing customers.

16. On February 8, 2000, Narragansett's power supply manager informed TransCanada via letter of the merger, explained the manner in which the WSOS Agreement would be administered after the merger and stated that the WSOS Agreement was not being modified in any way. The letter further stated that Narragansett would make FAF payments to TransCanada consistent with the Blackstone and Newport tariffs that the Rhode Island Commission had approved prior to the merger, and Eastern's approved tariffs in Massachusetts. It attached a Fuel Adjustment schedule consistent with that set forth in Blackstone's and Newport's retail standard offer service tariffs; that is, for each year from 2000 through 2004. Narragansett sent this letter to TransCanada in draft form and asked that TransCanada review it.

17. TransCanada and Narragansett's representative discussed the letter. After receiving no objection from TransCanada, on April 18, 2000, Narragansett's representative put the draft letter in final form and sent it to TransCanada.

18. In June 2000, in a public proceeding before the Rhode Island Commission concerning Narragansett's proposed retail standard offer service rates, Narragansett stated, on the record, that the FAF for the former Blackstone and Newport wholesale standard offer service agreements ("EUA Zone wholesale standard offer service agreements") would end after 2004. Docket No. 3138. These agreements included the WSOS Agreement.

19. On May 28, 2003, in a public hearing before the Rhode Island Commission regarding Narragansett's retail standard offer service rates, Narragansett told the Rhode Island Commission that it was not obligated to make FAF payments under the EUA Zone wholesale

standard offer service contracts (which included the WSOS Agreement) after 2004. Docket No. 3508.

20. In November 2003, Narragansett made a filing with the Rhode Island

. . which included a forecast that reflected zero FAF payments under the EUA Zone

21. On July 1, 2004, Narragansett filed an application with the Rhode Island Commission to set its standard offer service rates effective as of October 1, 2004 based upon Narragansett's actual costs incurred through May 2004 and its estimated costs from June 1, 2004 through December 31, 2005. Consistent with the retail standard offer service tariffs that the Rhode Island Commission had approved for Blackstone and Newport, the FAF payments that Narragansett informed TransCanada it would continue to make upon the merger, and Narragansett's public statements to the Rhode Island Commission, this filing showed that the Narragansett's proposed retail standard offer service rates did not include an amount for an FAF to be paid under the EUA Zone wholesale standard offer service agreements (which include TransCanada under the WSOS Agreement.)

22. The Rhode Island Commission approved Narragansett's standard offer service rates effective August 1, 2004 pursuant to an Open Meeting decision on July 26, 2004 and a written Order dated August 26, 2004. Order No. 17972 in Docket No. 3571. The approved rates did not include an amount for an FAF to be paid under the EUA Zone wholesale standard offer service agreements beyond December 31, 2004. Accordingly, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.

23. Likewise, on November 10, 2004, Narragansett made another filing relating to retail standard offer service. This filing was also publicly noticed. A Bench Decision at public

hearings on December 13, 2004, which was confirmed by a written Order issued February 17, 2005, approved Narragansett's filing, which was based on no FAF payments in relation to the EUA Zone wholesale standard offer servicc agreements (which include the WSOS Agreement.)

24. Consistent with the foregoing, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.

25. Narragansett at all times provided public notice of its filings and hearing dates in accordance with the rules and regulations of the Rhode Island Commission. All members of the public, including suppliers, are invitcd to participate through the public comment process at the Commission. Orders of the Rhode Island Commission are publicly available. In recent years, all of Narragansett's rate filings are posted on the Rhode Island Commission's website prior to the hearings, as are all Rhode Island Commission orders shortly after their issuance.

26. On information and belief, TransCanada monitors these proceedings closely, but has never filed testimony or otherwise commented to the Rhode Island Commission or Narragansett (or its affiliates) as to whether Narragansett should request the Commission to approve an FAF after 2004.

27. On March 1, 2005, TransCanada sent a letter to Narragansett, (a) claiming that Narragansett was in default of the WSOS Agreement by not providing for an FAF in its calculations; (b) asserting that Narragansett was in breach by its "[refusal] to comply with its obligations under Article V before the Rhode Island Public Utilities Commission with respect to its Standard Offer Service tariffs"; and (c) threatening to terminate the WSOS Agreement.

28. TransCanada's reference to Narragansett's lack of inclusion of an FAF in its calculations apparently refers to the calculations Narragansett performs prior to issuing payment. Narragansett's calculation was accurate because TransCanada was not entitled to a payment for

an FAF: the retail standard offer service rates did not include a Fuel Adjustment payment in relation to the WSOS Agreement.

29. TransCanada's assertion regarding obligations under Article V (sic) appears to suggest that Narragansett had an affirmative obligation to take an action before the Rhode Island

30. TransCanada's threat to terminate the WSOS Agreement is without cause and would itself constitute a breach of the WSOS Agreement.

31. At no point prior to March 1, 2005 did TransCanada provide Narragansett with a written notice of a dispute as required by the WSOS Agreement. The WSOS Agreement states: "If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date." WSOS Agreement, Art. 6, at 6

32. TransCanada's purported notice of default was baseless, and was accompanied by threats to terminate the Agreement. Its action was a pretext to enable TransCanada to avoid performing a contract that was no longer economically advantageous to TransCanada, whether or not fuel payments were made.

33. A TransCanada termination of the WSOS Agreement would not be justified, and would constitute a material breach; however, in order to preserve the benefit of the WSOS Agreement for its customers, and to deny TransCanada its pretextual argument for termination, Narragansett has paid to TransCanada, under protest, and with a full reservation of rights, a total of $921,827.46. The payments were based upon a calculation using the FAF that had been approved by the Rhode Island Commission for recovery in rates through, but not after, December 31, 2004. The payments relate to the period of January 1 through March 31, 2005.

34. TransCanada had knowledge and notice of Narragansett's intention not to seek Commission approval for recovery of FAF payments from its customers after 2004, and it never objected at any point in time prior to early 2005. TransCanada's subsequent threat to terminate the WSOS Agreement constitutes an attempt to extort payments from Narragansett that are not due under WSOS Agreement.

## COUNT I
## (BREACH OF CONTRACT)

35. Narragansett repeats and realleges paragraphs 1 through 34 as stated above.

36. TransCanada has demanded FAF payments from Narragansett that it is not entitled to under the WSOS Agreement, and has threatened to terminate the WSOS Agreement without cause, in order to avoid performing an agreement that is no longer economically advantageous to TransCanada, with or without FAF payments.

## COUNT II
## (DECLARATORY JUDGMENT)

37. Narragansett repeats and realleges paragraphs 1 through 36 as stated above.

38. TransCanada has threatened to terminate the WSOS Agreement even though TransCanada has no right to do so and no right to an FAF after 2004. Therefore, an actual controversy exists as to whether TransCanada has a right to terminate the WSOS Agreement.

## COUNT III
## (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

39. Narragansett repeats and realleges paragraphs 1 through 38 as stated above.

40. TransCanada has breached its obligation of good faith and fair dealing by: (a) failing to object at any point in time prior to March 2005 to Narragansett's stated intention to not provide in rates for collection of FAF payments from customers after 2004; (b) notifying Narragansett for the first time in early 2005 of TransCanada's expectation that Narragansett had



{J:\CLIENTS\lit\304810\0001\00547646.DOC;1}

an obligation to take an action before the Rhode Island Commission and its expectation that Narragansett was required to make such payments even absent approval to collect such costs in rates; and (c) threatening to terminate the WSOS Agreement as a pretext in order to avoid a contract that had become economically disadvantageous to TransCanada even with fuel payments.

## REQUESTS FOR JUDGMENT

WHEREFORE, Defendant and Counterclaim Plaintiff Narragansett seeks judgment as follows:

1. Dismissing the claims of TransCanada in their entirety with prejudice;

2. Awarding Narragansett compensatory damages for all damages caused by TransCanada's breach of contract, plus interest and costs;

3. Declaring that TransCanada has breached its obligation of good faith and fair dealing;

4. Declaring, pursuant to R.I. Gen. Laws § 9-30-2, that TransCanada does not have a right to terminate the WSOS Agreement; and for

5. Such other relief as the Court deems just and proper under the circumstances.

**NARRAGANSETT DEMANDS A TRIAL BY JURY ON ALL CLAIMS AND COUNTERCLAIMS.**

THE NARRAGANSETT ELECTRIC COMPANY
By its Attorneys,

/s/ Vincent F. O'Rourke, Jr.
Michael P. Angelini (BBO#019340)
Vincent F. O'Rourke, Jr. (BBO#380335)
Bowditch & Dewey, LLP
311 Main Street. P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Dated: June 7, 2005