# Exhibit 2

STATE OF RHODE ISLAND
AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION

RECEIVED
2003 JUN 16 AM 10: 56
PUBLIC UTILITIES COMMISSION

**HEARING IN RE:**

NARRAGANSETT ELECTRIC COMPANY
STANDARD OFFER RATE TARIFF FILING

DOCKET NO. 3508

--------------/

MAY 28, 2003
10:00 A.M.

89 JEFFERSON BOULEVARD
WARWICK, RHODE ISLAND

**BEFORE THE COMMISSION:**

ELIA GERMANI, CHAIRMAN
KATE F. RACINE, COMMISSIONER
ROBERT HOLBROOK, COMMISSIONER

CYNTHIA WILSON, LEGAL COUNSEL
ALAN NAULT, RATE ANALYST

**APPEARANCES:**

FOR THE COMPANY: TERRY SCHWENNESEN, ESQ.

FOR THE DIVISION: PAUL ROBERTI, ASSISTANT ATTORNEY GENERAL

FOR THE DEPT. OF THE NAVY: AUDREY VAN DYKE, ESQ.



ORIGINAL

I-N-D-E-X


| | PAGE NO. |
| --- | --- |
| HENRY SHELTON | |
| Statement | 10 |
| JEANNE A. LLOYD MICHAEL J. HAGER | |
| Direct Examination by Ms. Schwennesen | 24 |
| Cross-Examination by Mr. Roberti | 37 |
| Examination by Ms. Wilson | 37 |
| Examination by Mr. Nault | 83 |
| Further Examination by Ms. Wilson | 91 |
| DR. JOHN STUTZ | |
| Direct Examination by Mr. Roberti | 98 |
| Examination by Ms. Wilson | 101 |
| Examination by Commissioner Racine | 118 |
| Examination by Commissioner Holbrook | 121 |

is on Page 4, Line 16. 5.6 cents becomes 5.5. On Page 5, Line 4, 4.89 becomes 4.37 or approximately eight percent instead of nine percent. On Page 12, Line 18, 5.6 becomes 5.5. On Page 13, Line 4, 72.6 becomes 66.1. Line 7, same change; 72.6 becomes 66.1. Line 8, 37.6 becomes 31.1. Line 11, .9 becomes .8, and Line 13, 5.6 becomes 5.5. On Page 14, Line 4, 72.6 becomes 66.1. Line 7, 6.5 becomes 6.4. And Page 17, Line 1, 4.89 becomes 4.37. 59.50 becomes 58.98, .98 and nine percent becomes eight percent.

MS. SCHWENNESEN: Thank you, Ms. Lloyd. With those corrections is your testimony and your exhibits true than an accurate to the best of your knowledge?

MS. LLOYD: Yes, they are.

MS. SCHWENNESEN: Mr. Hager, I hand you an exhibit marked as Narragansett Exhibit 1C. First I'm going to identify you for the record. Thank you so much, sir. Could you please identify yourself?

MR. HAGER: I'm Michael Hager, Vice President, Energy Supply New England, National

Grid USA Service Company, 55 Barefoot Road, Northboro, Massachusetts.

MS. SCHWENNESEN: Would you state your title for the record?

MR. HAGER: I did. Vice President Energy Supply New England.

MS. SCHWENNESEN: Okay. Sir, would you please describe Exhibit 1C? Is that your testimony prepared by you or under your supervision?

MR. HAGER: Exhibit 1A includes direct testimony prepared by myself and a series of exhibits.

MS. SCHWENNESEN: Is that marked as 1C?

MR. HAGER: 1C. I'm sorry. Yes.

MS. SCHWENNESEN: Are those testimony and exhibits true and accurate to the best of your knowledge?

MR. HAGER: Yes, they are.

MS. SCHWENNESEN: Thank you.

MS. WILSON: Mr. Hager, do you adopt the respective testimony as your testimony here today?

MR. HAGER: I do.

high in the summer, so my sense of the usage, the maximum usage I have is July and August.

MS. LLOYD: I understand. So for a customer whose usage varies by month going into the season, what the effect would be?

THE CHAIRMAN: Yes.

MR. NAULT: I would also be interested in non-residential impacts. I would imagine most of those are probably fairly stable rates throughout the year.

MS. LLOYD: Probably for the most part. Some would vary. Of the same analysis or are you talking about the three scenarios now?

MR. NAULT: The three scenarios.

MS. LLOYD: All right. I'll provide yours for every rate class.

MR. NAULT: Thank you. Narragansett has standard offer contracts out to 2009 and there are fuel adjustment clauses attached to those contracts. But for the record, are those fuel adjustment contracts -- fuel adjustments attachments to the contracts on all territories through 2009?

MR. HAGER: The standard offer

contracts come in two basic varieties. Contracts associated with what we call the Narragansett zone, that's the Narragansett service territory prior to its merger with EUA, and the contracts in that zone have the fuel adjustment clauses hard wired into those contracts as attachments in part of the pricing provisions. The other form of contract is in what we call the EUA zone, the service territory of Blackstone Valley Electric Company, Newport Electric Company prior to the merger into Narragansett. Those forms of contracts, the price sections specify the fixed price components which is identical to the fixed price components in the Narragansett zone contracts. Rather than have the standard offer fuel adjustment provision as an integral component of the contract there's a reference in the pricing section to the standard offer adjustment provisions that were contained in the former EUA retail company tariffs and the supplier would get the revenues that were collected pursuant to those tariffs. In May of 2000 when we completed the merger the EUA company tariffs ceased to exist and as Narragansett

assumed the responsibilities under those contracts we notified those suppliers that we would continue to make the fuel adjustment payments pursuant to the terms that were contained in the tariff at the time. So we're making those payments by reference to a tariff as opposed to being part of our attachment to the contract.

MR. NAULT: And that will extend through 2009?

MR. HAGER: It's Narragansett's opinion that the -- it is a fact that the tariffs at the time of the EUA merger only included fuel adjustment trigger amounts and payments through 2004. It's Narragansett's opinion that those suppliers are only entitled to fuel adjustment payments through 2004 and that they cease to those entitlements on January 1, 2005, whereas in the Narragansett zone contracts, those do include trigger payments through 2009.

MR. NAULT: So could I very simply say that the fuel adjustment clause component in the EUA zone will cease to exist after 2004?

MR. HAGER: That's the position that

FURTHER EXAMINATION BY MS. WILSON

MS. WILSON: When did you notify suppliers of this interpretation of the EUA contracts?

MR. HAGER: We have not made formal notification to suppliers. There has just been -- during the normal course of discussions in business we have made reference to -- in discussing various fuel trigger payments that we've just brought it up in conversations that that condition exists.

MS. WILSON: Just for the record, my concern as Commission counsel is that the Commission has and the Division as well has plenty of clear warning if this is going to become a contested issue and that it not become a short -- a decision that the Commission is being asked to make sometime in the future but in a short period of time. In other words, if there's a dispute and it results in some sort of agreement that the Commission needs to look at it, I request that the Commission be given sufficient enough time to be able to look at it and the Division be able to fully look at those

issues.

MR. HAGER: Should there be a dispute of those issues, we will promptly inform the Commission and Division of such issues.

MS. WILSON: I did want to go back to one issue. It was Mr. Shelton's issue. The -- Narragansett still has an A-60 rate for low income customers, correct?

MS. LLOYD: That's right.

MS. WILSON: And in looking at JAL-5, Revised Page 4 of 23 it looks like the average A-60 customers without a credit for a water heater uses 380 kilowatt hours per month.

MS. LLOYD: Yes, 380.

MS. WILSON: And it looks like they're starting out with a bill -- an average bill of $33.88 and that with the proposed rate of five-and-a-half cents per kilowatt hour their bill would go up to $37.20 per month as opposed to an A-16 customer which is an average residential customer not on -- not falling into those low income guidelines.

MS. LLOYD: Well, this is based on 380 kilowatt hours.

the company is taking with its suppliers, yes.

MR. NAULT: And if the company's position proves correct, will that mean that the potential amount of fuel adjustment charges, expenses that the company would incur would be reduced, everything else being equal, between -- from 2004 to 2005?

MR. HAGER: As of April, 2003 roughly 73 percent of our standard offer load was served under Narragansett zone contracts and the other 27 percent was served under former EUA contracts. Our hope is that by the time we get out to 2005 the trigger levels under which payments will be made, they increase annually, that they are finally at a level that even though we get these extraordinary increases in gas and oil prices that we didn't trigger the payments under the contracts and there are no payments under each form. However, if we do exceed that trigger amount, we will only be paying fuel amounts on the roughly 73 percent as of today that's covered under the Narragansett contracts and we wouldn't be paying any amounts under the EUA contracts and thus customers will be seeing less fuel expenses

and they will see lower expenses than they are in today's environment.

MR. NAULT: Okay. And in a lot of what you just said you said in Narragansett's opinion and the company's opinion. What about the suppliers' opinion?

MR. HAGER: We've informed them that that's what it is. We wait to see if they accept our belief or whether they wish to pursue the issue in some manner.

MR. NAULT: But that's still out to debate between Narragansett and the suppliers?

MR. HAGER: I'm not aware of any supplier who disputes that, but I think suppliers are hoping that there's a continuation and it's our opinion that the record should be clear that those payments cease in 2004 and there was no expectation, should have been no expectation on their part at the time that amounts would continue.

MR. NAULT: Okay. Thank you. Thank you, both.

MS. WILSON: May I have a follow-up?

THE CHAIRMAN: Sure