STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PUBLIC UTILITIES COMMISSION

IN RE: BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION

STANDARD OFFER SERVICE DOCKET NO. 2716

REPORT AND ORDER

On April 15, 1998, the Blackstone Valley Electric Company ("BVE") and Newport Electric Corporation ("Newport") (together, the "Companies") filed rate changes with the Public Utilities Commission ("Commission") pursuant to R.I.G.L. §39-3-10, to become effective June 1, 1998. This was the second filing made to satisfy the Companies' obligations under the terms of a settlement agreement dated October 17, 1997 amongst the Companies, Montaup Electric Company ("Montaup"), the Division of Public Utilities and Carriers ("Division") and the Commission ("Settlement Agreement") that was filed with, and approved by the Federal Energy Regulatory Commission (" FERC"). The Settlement Agreement provides, in relevant part, for the implementation of Rhode Island's Utility Restructuring Act of 1996, as amended ("URA"). The general objective of the URA is to deregulate electric power supplies and allow the development of a competitive market for the purchase of electricity.

The Companies are wholly owned subsidiaries of Eastern Utilities Associates ("EUA"), an integrated public utility holding company. The Companies are engaged primarily in the distribution of electricity to customers located in Rhode Island. The Companies purchase all their energy requirements from Montaup, EUA's wholesale generating and transmission subsidiary. The power has been purchased under the terms

of a long-term all-requirements contract, the terms and prices of which have been regulated by the FERC.

A public hearing was held on May 12, 1998. The following appearances were entered in this proceeding:

| | |
|---|---|
| FOR THE COMPANIES | David A. Fazzone, Esq.<br>McDermott, Will & Emery |
| FOR TEC-RI | Andrew Newman, Esq.<br>Rubin and Rudman, LLP |
| FOR THE DIVISION | Paul J. Roberti<br>Chief, Public Utilities Regulatory Unit<br>Office of the Attorney General |
| FOR THE COMMISSION | Adrienne G. Southgate<br>General Counsel |
| | Lindsay Johnson<br>Special Counsel |

I. INTRODUCTION

On November 7 and 17, 1997, the Companies filed proposed Standard Offer rates and Last Resort Service rates which were designed to implement open access and bring competition to the Companies' ratepayers.[1] The rates mandated retail access to alternative suppliers of electricity. Simply put, the rates required the Companies to allow their customers to purchase electricity from other suppliers of electricity and required the Companies to transport any such purchases on their lines from the supplier to the customer.

[1] The Commission approved the filed rates with some changes on December 17, 1997. See Order No. 15521 dated July 10, 1998.

In its decision, the Commission found that the proposed rates did not qualify as Standard Offer rates under the URA because the wholesale power supply had not been awarded by public competitive bidding.[2] Accordingly, while it approved the rates, the Commission ordered the Companies to designate such rates "Interim Power Rates". These rates are based upon the wholesale charge of 3.2¢ per kilowatt hour (kWh") to the Companies for wholesale standard offer service.[3] The 3.2¢ wholesale charge reduced purchased power costs by 30% for BE and 14% for Newport.[4] In order to provide a reduction to all customers, the Companies reduced purchased power costs by 30% for BE and 14% for Newport.[5] The rate structures for each rate class (whether reflecting energy, demand, or time-of-use-charges) have been maintained.

Since that decision, the Companies have put their power supply out to bid in an effort to satisfy the requirements of both the Settlement Agreement and the URA.[6] The Companies now contend that the proposed rates are in compliance with R.I.G.L. §39-1-27.3(d) and they have designated the rates as Standard Offer Service. In addition, the Companies have filed a Standard Offer Cost Adjustment provision ("SOCA") designed to replace the Interim Generation Service Revenue Reconciliation Adjustment. The purpose of the SOCA is to allow the Companies to adjust rates to collect or refund the amount of any over- or under-collection of Standard Offer Rates.[7]

---

[2] R.I.G.L. §39-1-27.3(d), as amended.
[3] Ex. EUA-1.
[4] Id.
[5] Id.
[6] Ex. EUA-A, pp. 14-27. All page references in this exhibit are to the page numbers of the volume which are shown on the bottom right of each page.
[7] Ibid., p. 36.

II. POSITIONS OF THE PARTIES

The Companies, the Division and TEC-RI presented witnesses who testified on the filed rates.

A. THE COMPANIES

The Companies presented the testimony of three witnesses in support of its filing. Mr. Michael J. Hirsh, Vice President of EUA Service Corporation ("EUASC"), BVE, Newport and Eastern Edison Company,[8] testified that the purpose of the Companies' filing was:

1. to present the Companies' proposed retail Delivery Standard Offer Service tariffs offered to comply with R.I.G.L. §39-1-27.3(d);
2. to describe the results of the Companies' Standard Offer Service and Last Resort Service competitive procurement processes; and
3. to address the reasonableness of the Companies' proposal to continue Last Resort Service under the same terms that have been in place since January 1, 1998.[9]

Mr. Lawrence R. Boisvert, Supervisor of Power Supply Administration for EUASC, testified on the competitive bidding procedures and the results of the Standard Offer Service and the Last Resort /Default Service Requests for Proposals ("RFP") that the Companies issued.[10]

Mr. Boisvert testified that under the Settlement Agreement, the Companies entered into an agreement entitled Purchase of Electric Service for Resale, Amendment to Service Agreement with Montaup[11] ("ASA"). Under the terms of the ASA, Montaup is committed to provide the Standard Offer power supply to the Companies at fixed

[8] Ibid., p. 3
[9] Ibid., pp. 4-5.
[10] Ibid., p. 15.

Standard Offer prices, subject to a fuel index,[12] over the term that the Standard Offer will be available in Rhode Island.[13] In the event that the Companies reduce their purchases from Montaup by purchasing wholesale standard offer power supply from another supplier, Montaup has no further obligation to supply that portion of the Companies' Standard Offer Load.[14]

Mr. Boisvert testified that the Companies issued the Standard Offer RFP to comply with the requirements of the Settlement Agreement and with the provisions of the URA.[15] Suppliers were required to bid for a percentage of the Companies' load and to bid a percentage discount off the wholesale standard offer rates stipulated in the ASA.[16] Mr. Boisvert testified that the Companies received no qualifying bids for wholesale standard offer Service and that, consistent with the Settlement Agreement, the Companies will continue to receive service under their contracts with Montaup until such time that a qualifying bid may be received in a future RFP.[17] He indicated that the Companies intend to issue another RFP in the fourth quarter of this year.[18]

Mr. Boisvert testified that the Companies also put Last Resort Service out to bid as required by the URA. [19] The URA provides:

> [E]ach distribution electric distribution company shall . . . arrange for a Last Resort power supply for customers who are no longer eligible to receive service under the Standard Offer and not adequately supplied by the market

---

[11] EUA-3, Attachment 1B.
[12] Ibid., p. 12.
[13] Ex. EUA-A, p. 18.
[14] Id.
[15] Ibid., p. 15.
[16] Ibid., p. 17.
[17] Ibid., p. 20.
[18] Tr. 5/12/98, pp. 107-108.
[19] R.I.G.L. §39-1-27.3(f).

because they are unable to obtain or retain electric service from non-regulated power producers.[20]

Mr. Boisvert indicated that the Companies issued an RFP for Last Resort Service.[21] While the Company received two qualifying bids, it did not accept the bids because each bid required a fixed payment that would have made the cost of Last Resort Service "much higher than the wholesale standard offer price."[22] Alternatively, the Companies propose to offer Last Resort Service at the same price as Standard Offer Service until a competitive procurement of Last Resort Service can be successfully implemented.[23]

Finally, Mr. James J. Bonner, Jr., Supervisor of Rate Design for EUASC, testified in support of the Companies' proposed Standard Offer Service and Last Resort Service tariffs.[24] He testified that the Standard Offer tariffs and the Last Resort Service tariffs were nearly identical to the tariffs currently in effect.[25] The only difference in the Standard Offer Service tariff is a SOCA that would operate on a prospective basis.[26]

B. THE DIVISION

The Division presented the testimony of Dr. John K. Stutz, Vice President of Tellus Institute. Dr. Stutz's testimony included a number of recommendations that were incorporated in the Companies' filed testimony.[27] In addition, Dr. Stutz recommended that the SOCA should be based on actual experienced cost data rather than estimates as

---

[20] Id.
[21] Ex. EUA-A, p. 21.
[22] Ibid., p. 24.
[23] Ibid., p. 25.
[24] Ibid., pp. 28-44.
[25] Ibid., p. 34.
[26] Ibid., p. 35.
[27] For example, Dr. Stutz recommended that the pricing of Standard Offer Service to "new" and "old" customers should be the same. Division Ex.-A. In addition, consistent with the eligibility provision of the Last Resort Service tariff, he recommended that customers who are not eligible for Standard Offer Service

proposed by the Companies. During the hearings, to address this concern, the Companies filed a modified SOCA that required the use of actual cost data.[28]

C. TEC-RI

Mr. Roger L. Buck, Executive Director of the Energy Council of Rhode Island ("TEC-RI"), testified on behalf of a consortium of about 95 major energy users in Rhode Island.[29] Mr. Buck testified in support of two rate design principles. First, he testified that TEC-RI supported the "designed standard offer pricing mechanism" which was employed to design the presently effective rates.[30] TEC-RI opposes the uniform pricing method, which would price each kWh of usage at the flat rate that the Companies pay to their wholesale supplier.[31] He testified that the uniform method would cause customers with high load factors to experience "a much smaller decrease in their rates".[32] Mr. Buck also recommended a provision in the tariffs that would fix the amount of future rate increases needed to pay for the increase in the wholesale standard offer rates stipulated in the Settlement Agreement.[33]

---

and who are not able to retain service from non-regulated power producers, due to cost, should be eligible to receive Last Resort Service. Ibid., p. 4.

[28] Ex. EUA-B.

[29] Ex. TEC-RI-A.

[30] Id.

[31] Id.

[32] Id.

[33] Id.

## III. FINDINGS

### A. STANDARD OFFER

#### 1. Competitive Bidding Requirements

The URA provides:

> The power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest priced power supplier.[34]

The Companies' power supply acquisition procedures are also stipulated by the Settlement Agreement. First, the Settlement Agreement includes the provisions of the ASA.[35] Second, the Settlement Agreement required the Companies to issue an RFP.[36] To qualify, a proposal was required to produce cost savings to the Companies. Any qualifying bidder, in turn, would be required to enter into a Standard Offer Service Agreement ("SOSA"). If the RFP did not solicit enough qualifying bids to meet the Companies' load requirements, the Settlement Agreement requires Montaup to supply the difference.

The Companies did receive one bid in response to the RFP solicitation.[37] This proposal, however, did not conform to the requirements of the RFP because it was for pre-scheduled capacity and energy delivered to the NEPOOL transmission system.[38] The proposal was rejected. Consequently, the Companies continue to receive their power supply requirements from Montaup under the terms of the ASA.

---

[34] R.I.G.L. §39-1-27.3(d), as amended. The FERC Settlement Agreement also requires the Company to put its power supply out for competitive bid.
[35] Ex. EUA-A, pp. 17-18.
[36] Id.
[37] Ibid., p. 19.
[38] Id.

The Commission finds that the Companies have satisfied the competitive bidding requirements of the URA. This finding is based on the fact that the terms of the ASA and the SOSA are substantially the same. In addition, while there was some difference in the timing of the bids, all parties were bidding to provide all or some portion of the same load. The result was that unless the ASA produced the lowest cost to the Companies, the power would be provided by other suppliers. This procedure is consistent with the competitive bidding requirement of the URA.

2. Standard Offer Supply Contract

The URA also requires each distribution company to acquire a power supply adequate to provide service to "customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers".[39] As originally enacted, the URA provided:

> [E]ach electric distribution company shall arrange with its wholesale power supplier for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers.[40]

On July 7, 1997 the URA was amended to require that the Standard Offer power supply be competitively bid. This provision of the URA, as amended, now reads:

> [E]ach electric distribution company shall arrange for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers. The power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest priced power supplier.[41]

---

[39] R.I.G.L. §39-1-27.3(d), as amended.
[40] Id
[41] R.I.G.L. §39-1-27.3(d), as originally enacted by P.L. 1996, ch 316, §1.

The statute requires that the distribution companies enter into a power supply arrangement that is adequate to provide power "to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers".[42] The Companies, however, took the position that the ASA required Montaup to provide service to only those customers who were on the system as of January 1, 1998.[43] For this reason, Mr. Hirsh testified that it was "likely that the Companies would need to solicit supply to meet the requirements of customers that take service after January 1, 1998."[44] The Division, on the other hand, took the position that the ASA required Montaup to provide service to customers that take service after January 1, 1998.[45]

The ASA provides:

> The Company shall provide "Standard Offer Service" to Customer commencing on the Contract Termination Date and continuing for the period through December 31, 2009 (the "Standard Offer Period"). Standard Offer Service shall consist of the wholesale supply of power sufficient to meet the requirements of retail customers served by the Customer's distribution system that purchase Standard Offer retail service from the Customer.[46]

The Companies argued that the ASA must be interpreted in light of all the facts surrounding the execution of the Agreement.[47] The essence of this argument appears to be that Montaup would not have agreed to a literal interpretation of this provision because a literal interpretation of the provision would place a hardship on Montaup.[48] Mr. Hirsh

---

[42] Id.
[43] Ex. NEC-A, p. 10.
[44] Id.
[45] RIPUC 1-1 (Division Response to Commission Data Request dated May 7, 1998).
[46] Ex. EUA-3, Attachment 1B, Purchase of Electric Service For Resale, Amendment to Service Agreement (ASA), Section 10, pp. 7-8. In the ASA, Montaup is referred to as the Company and the Companies are referred to as the Customer.
[47] Ex. EUA-C, Comm-1-3.
[48] Id.

referenced other sections of the ASA that in his opinion indicated that Montaup is not responsible for providing power to the Companies' new customers.[49]

The Commission is not convinced by the Companies' arguments. The Commission finds that, consistent with the requirements of the URA, Section 10 of the ASA requires Montaup to provide service to **all** customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers. Accordingly, the Commission finds that as of June 1, 1998, the Companies have acquired the power supply required by the URA.

It follows from the Commission's finding that the Companies need not incur costs in excess of the ASA wholesale standard offer rates to supply service to the new customers. Accordingly, if the Companies incur additional costs by purchasing such power from a different supplier, such costs will not be recoverable under the SOCA unless the Companies satisfy the considerable burden of establishing that the costs were prudently incurred.

3. Price Cap

The URA also places a cap on the price of the Standard Offer rates. The URA provides that:

> The Standard Offer shall be priced such that the average revenue per kilowatt-hour received from the customer for such power together with approved distribution, transmission and transition charges shall equal the price that would have been paid under rates in effect during the twelve (12) month period ending September 30, 1996 adjusted annually for eighty percent (80%) of the change in the consumer price index for the immediately preceding twelve (12) month period, and also for other factors reasonably beyond the control the electric distribution company and its former wholesale power supplier including but not limited to changes in federal, state or local

[49] Tr. 12/12/98, pp. 47-54.

> taxes or extraordinary fuel costs; provided, however, that adjustments to the standard offer for factors other than inflation must be approved by the commission. The standard offer is to be a price cap and may, after notice to the commission, be less than the maximum allowed at anytime for the generation component of the standard offer.[50]

The difficulty with this provision is that it is not clear how the cap should be applied. The cap is placed on "the average revenue per kWh received from the customer".[51] It is not clear whether this test applies to each customer, each customer class or to total annual customer revenues.

Assuming the price cap applies to total annual customer revenues, the Commission finds that the Standard Offer rates do not produce average revenues in excess the URA price cap.[52] If the cap applies to the average revenues from each customer class, the Commission finds that the Standard Offer rates for each customer class do not exceed the URA cap.[53] There is nothing in the record to indicate how many customers would pay average revenues in excess of the price cap.

The Commission will allow the filed rates to go into effect so as not to delay implementation of the URA. However, the Commission will continue to pursue the interpretation of the legislative intent embodied in the Standard Offer price cap provision of the URA. This effort will include seeking a declaratory judgment from the courts. It must be emphasized that the Commission is not making any determination of how the

[50] R.I.G.L. §39-1-27.3(f).
[51] Id.
[52] Ex. EUA-1, Attachment 4.
[53] Ex. NEV-3.

price cap should be applied in any future proceeding and shall require the Company to address this issue in any future rate proceeding[54].

B. STANDARD OFFER SERVICE TARIFFS

1. Standard Offer Cost Adjustment

The Companies have filed a Standard Offer Cost Adjustment.[55] Under the terms of the SOCA, the Commission would be required to refund any over- or under-collection of Standard Offer power costs "on a uniform cents per kilowatthour basis to the bills of all customers taking Retail Delivery Service from the Companies".[56] In other words, the under- or over-recovery would be applied to the bills of customers who are not taking Standard Offer Service and are purchasing from nonregulated power suppliers, as well as to Standard Offer customers.

The Division contends that this approach is required to prevent the Standard Offer price signal from becoming blurred.[57] The argument is that the adjustment should be spread over all customers to minimize any incremental charge to the Standard Offer Rate. The objective is to keep prices as close to the Standard Offer Rates as possible, so that ratepayers get a clear price signal that allows them to shop for power.[58]

This argument would have more appeal if it were known that the Standard Offer Service would be offered at Standard Offer rates. There is no assurance that this will

---

[54] The Company has expressed its intent to modify its rates to impose a flat uniform rate when the Residual Value Credit is realized upon the sale of Narragansett's and NEP's non-nuclear generating assets. Ex. NEC-1, pp. 20-22. At that time, it is also possible that another party may propose the continuation of the existing rate design. In either event, the Commission will require the Company or any other party to demonstrate that any proposed change in rates is in actual compliance with the URA.
[55] Ex. EUA-B.
[56] Id.
[57] Brief of the Division filed May 27, 1998, p. 2.

occur, because the Companies intend to put their entire supply requirements out to bid in the fourth quarter of 1998. Until the source and cost of the Companies' power supplies become known, the price of Standard Offer Service is unknown, and there can be no clear price signals.

The record simply does not support the position taken by either the Companies or the Division on this issue. It is possible, however, that future developments could justify their position on the matter. Accordingly, the SOCA filed by Companies is approved with the following modifications:

> The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.
>
> By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.[59]
>
> At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be

---

[58] Id.

[59] The Commission also finds that, as a matter of policy, the adjustment tariffs of the electric utilities in the State should be reasonably uniform where circumstances warrant. Accordingly, the revised language is very similar to the language from the Narragansett Electric Standard Offer Adjustment Provision. See Order No. 15639, issued on July 10, 1998.

applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service Costs and revenues that exist.[60]

2. Standard Offer Calendar Year Multiplier Table

The Standard Offer Service tariff proposed by the Companies stipulates that the retail rate shown in the tariff shall be multiplied times the Standard Offer Calendar Year Multiplier Table to obtain the retail rate for any given year. The purpose of the table is to escalate the retail rates to reflect scheduled increases in the wholesale standard offer rates.

The Commission finds that the adoption of the multiplier table is not warranted because the Companies intend to put their entire supply requirements out to bid in the fourth quarter of 1998. Until the source and cost of the Companies' power supplies become known, the price of Standard Offer Service is unknown and an accurate price multiplier can not be established. The Commission finds that the Companies have failed to establish the factual basis for the proposed multiplier table, and orders the Companies to remove the tables and any references to them from their Standard Offer Service tariffs.

C. LAST RESORT SERVICE

The URA requires that distribution companies act as suppliers of last resort to those customers who otherwise may be unable to obtain service in a competitive market.[61] Specifically, the URA requires each distribution company to:

> [A]rrange for a last resort power supply for customers who are no longer eligible to receive service under standard offer and are not adequately supplied by the market because they are unable to obtain or retain electric service from nonregulated power producers. The electric distribution company shall periodically solicit bids from nonregulated power producers for such service at market prices plus a fixed contribution from

[60] Ex. EUA-B.
[61] R.I.G.L. §39-1-27.3(f).

> the electric distribution company. . . . . All fixed contributions and any reasonable costs incurred by the electric distribution company in arranging this service shall be included in the distribution rates charged to all other customers.[62]

The Companies issued an RFP for Last Resort Service power supply as required by the URA.[63] Two proposals were received.[64] In each case, however, the proposals included fixed fees that produced per kWh prices in excess of the Standard Offer Rates.[65] Accordingly, the Companies "propose to continue serving Last Resort Service at the same price as Standard Offer Service until a competitive procurement of Last Resort Service can be successfully implemented".[66] Because the Companies' proposal results in lower Last Resort Service rates, the Commission finds the Companies' proposal to be reasonable and approves it provided, however, that the Companies shall continue to periodically issue RFPS for Last Resort Service power supply as required by the statute.

(15640) ORDERED:

1. That the Standard Offer prices filed by the Companies are approved for consumption on and after June 1, 1998.
2. That the Standard Offer tariffs shall be modified in accordance with the findings and instructions contained in this Report and Order.
3. That the Standard Offer Cost Adjustment provision shall be modified in accordance with the findings and instructions contained in this Report and Order.

---

[62] Id.
[63] Ex. EUA-A, p. 23.
[64] Id.
[65] Ibid., pp. 23-24.
[66] Ibid., p. 25.

4. That the Last Resort Service tariff is approved as filed for consumption on and after June 1, 1998.

5. That the Companies shall file tariffs modified in accordance with the findings and instructions contained in this Report and Order.

6. That the Companies shall act in accordance with all other findings and instructions contained with this Report and Order.

EFFECTIVE AT PROVIDENCE, RHODE ISLAND PURSUANT TO OPEN MEETING DECISIONS ON MAY 29 AND JULY 9, 1998. WRITTEN ORDER ISSUED JULY 10, 1998.

PUBLIC UTILITIES COMMISSION

James J. Malachowski, Chairman

Kate F. Racine, Commissioner

Brenda K. Gaynor, Commissioner