UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>TRANSCANADA POWER MARKETING LTD.,<br><br>Defendant. | ) | C.A. No. 05-234-S |

**AFFIDAVIT OF MICHAEL HACHEY**

I, Michael Hachey, hereby depose and state as follows:

1. I am currently the Director, Eastern Commercial for TransCanada Power Marketing, Ltd ("TransCanada"). I have worked for TransCanada for 7 years. I make this affidavit in further support of TransCanada's Motion to Dismiss, Stay or Transfer Venue. I was personally involved in the negotiations leading up to this litigation and make this affidavit on personal knowledge.

2. On March 1, 2005, TransCanada provided notice of default to Narragansett, arising from Narragansett's Standard Offer Service ("SOS") tariff filings and nonpayment of a Fuel Adjustment Factor ("FAF") under a Wholesale Standard Offer Service Agreement dated April 7, 1998 (the "WSOS Agreement"). [*See* 3/1/05 Hachey Letter attached as Ex. 1.]

3. At a meeting on March 7, 2005, TransCanada and Narragansett met to discuss their respective positions. They disagreed on the merits. TransCanada discussed terminating the Agreement or initiating a Court action following the 30 day cure period, to which Narragansett



3985809v1

objected. Narragansett maintained that the parties had agreed to mandatory arbitration, but TransCanada pointed out that the Agreement provided for discretionary arbitration. Narragansett suggested TransCanada consider expedited resolution through fast-track arbitration or a declaratory judgment action, and TransCanada expressed willingness to discuss expedited resolution.

4. On March 31, 2005, Narragansett began making payments to TransCanada, under protest and with reservation of rights. [*See* Hager 3/31/05 Letter, attached as Ex. 2.] No change was made to Narragansett's SOS tariff filing for 2005, which omitted an FAF for TransCanada, and TransCanada received no promise of continued or future FAF payments.

5. From April 1, 2005 through April 19, 2005, counsel to the parties negotiated the terms for a proposed expedited arbitration and exchanged drafts of a proposed arbitration agreement. During those discussions in early April, Narragansett's counsel suggested that the protest payments should relieve some of the urgency in TransCanada's proposed arbitration schedule. In response, TransCanada's counsel indicated that, while the protest payments alleviated some of the pressure, the protest payments remained in dispute and were not guaranteed in the future, and TransCanada still required that any arbitration be completed on an expedited schedule. TransCanada then and at all times insisted that arbitration was an option only if it could be accomplished on an expedited basis and only if all arbitration terms could be agreed upon. TransCanada consistently thought and indicated that Narragansett's proposals were on too slow a schedule. [*See* emails between Winston and Kavanah dated 4/1/05; 4/6/05; 4/8/05; 4/12/05; 4/13/05(9:32 am, with embedded); 4/13/05(1:27 pm); 4/14/05(6:33 pm); 4/18/05(1:32 pm); and 4/19/05, attached as Exs. 4-12; Affidavit of Dan Winston ("Winston Aff."), attached as Ex. 3, ¶2.]

6. On April 19, 2005, TransCanada sent Narragansett proposed revisions to the arbitration proposal. TransCanada's proposal required initiation of the arbitration upon execution in order to meet TransCanada's proposed schedule. [*See* Winston 4/19/05 e-mail and proposal (Ex. 12).] The parties had also agreed that the arbitration was to be initiated with the filing by TransCanada of a Statement of the Dispute (within 3 business days of execution and as early as April 26, 2005), to which Narragansett would file an Answer within 6 or 10 business days. [*See* 4/18/05 email and proposal (Ex. 11); 4/19/05 email and proposal (Ex. 12).] In TransCanada's view, the last arbitration proposals still contained substantial points of disagreement, including the schedule, the confidentiality terms, and the treatment of protest payments.

7. On April 20, 2005, at 3:14 p.m., TransCanada sent an e-mail to Narragansett's counsel inquiring about the proposed arbitration agreement. [*See* 4/20/05 Winston email, attached as Ex. 13.] Narragansett's counsel then called TransCanada's counsel that same afternoon. During this April 20, 2005 phone call, Narragansett's counsel stated that the matter had now gone to the highest levels at National Grid; that Narragansett was no longer sure it wanted to arbitrate at all; and that at that point Narragansett wanted to talk settlement and was not willing to respond to TransCanada's arbitration proposal. [*See* Winston Aff., ¶3.]

8. Kavanah suggested during the April 20, 2005 phone call that the parties explore settlement at a meeting on Friday, April 22, 2005. Kavanah further suggested that the parties meet on Monday, April 25, 2005 with the Rhode Island Division of Public Utilities and Carriers ("Rhode Island Division") to discuss settlement, subject to confirming the availability of Division representatives. TransCanada agreed to meet on April 22, 2005 and agreed to defer



3985809v1

further discussion about the proposed arbitration agreement and Narragansett's objections only until Tuesday, April 26, 2005. [*See* 4/40/05 email exchange, attached as Exhibit 14; Winston, Aff. ¶3.]

9. The parties met on April 22, 2005 to discuss settlement. No constructive proposal came out of that meeting, but the parties agreed to still meet with the Division on April 25, 2005.

10. On April 25, 2005, the parties met with the Rhode Island Division. At this meeting, attended by Dan Winston and myself for TransCanada; Thomas Robinson, Laura Olton, Ron Gerwatowski and Michael Hager of Narragansett; and Steve Scialabba and Assistant Attorney General Paul Roberti for the Division, TransCanada stated and argued its legal position for benefit of the Division. TransCanada stated during this conversation that it had the right to initiate, and might initiate, a Court action to resolve the dispute.

11. Later during the same April 25, 2005 meeting, Thomas Robinson, Deputy General Counsel for National Grid, distributed a one-page handwritten "Tentative Term Sheet for Proposed Resolution" for the parties and Division to consider. This particular proposal had not previously been presented to TransCanada. The proposal anticipated that Narragansett would pay TransCanada its requested FAF for the duration of the WSOS Agreement. Narragansett could initiate public bids for a replacement supplier for the WSOS Agreement (and another SOS Agreement which, like the WSOS Agreement, also required TransCanada to supply electricity at below current market prices), on September 1, 2005 and then again on September 1, 2006. If a replacement supplier was accepted by Narragansett in either bid, TransCanada would be released from the WSOS Agreement and would receive FAF payments up to that point. The proposal also expressly required approval by the Rhode Island Public Utilities Commission ("PUC"). [*See* Tentative Term Sheet, attached as Ex. 15.] TransCanada, the Division and Narragansett

discussed Narragansett's proposal, and TransCanada and the Division agreed to consider Narragansett's proposal further.

12. After the meeting and also on April 25, 2005, Winston sent Kavanah an e-mail stating "[b]ased on our discussions down at the PUC today, which I assume you have been debriefed on, TransCanada would be willing to hold off further negotiation on the arbitration agreement through the end of this week to see how things progress. Assuming you are agreeable to that extension, let's revisit on Monday." [*See* Winston 4/25/05 email, attached as Ex. 16.]

13. On Friday, April 29, 2005, I told Robinson that the April 25 proposal was okay subject to moving the secondary bid date back to June 1, 2006. Narragansett agreed to that change, and the parties further agreed that Narragansett would draft a revised settlement proposal to present to the Division and PUC.

14. On Monday and Tuesday, May 2 and 3, 2005, the parties heard from the Division before submitting the revised April 29 proposal. On May 3, 2005, Steve Scialabba from the Division also e-mailed the parties. Mr. Scialabba's email rejected the original terms which Narragansett had proposed on April 25, 2005, and required significantly different terms for further settlement discussions. In essence, the Division required a settlement framework under which TransCanada would be paid only half the FAF, up until a public bid by Narragansett. If Narragansett accepted a replacement bid, which would require Division and PUC approval, TransCanada would then be released from the WSOS Agreement (and a second Supply Agreement). If Narragansett did not accept a replacement bid, TransCanada would receive no further FAF payments after that point and would retain only rights to litigate. The Division stated that it would be willing to listen to proposals concerning modification to the timing of the

bids and release dates, if its revised settlement framework was acceptable. [*See* Scialabba 5/3/05 email, attached as Ex. 17.]

15. In TransCanada's view, the Division's required settlement framework was entirely unworkable from a settlement standpoint, and could not form the basis for settlement discussions: the Division needed to approve any settlement, and its framework required TransCanada (i) to permanently waive half of the FAF payments up until any public bid by Narragansett, (ii) to receive *no* further FAF payments thereafter, as well as no guarantee that TransCanada would be released from the WSOS Agreement. The April 25 and 29 proposals, in contrast, guaranteed TransCanada full payment of an FAF throughout the duration of the WSOS Agreement, and provided the possibility of full release from the WSOS Agreement with FAF payments up to that date.

16. I also had a telephone conversation with Mr. Scialabba on or around May 3, 2005, in which Mr. Scialabba confirmed that the Division's position was firm and had been discussed and approved personally by the administrator of the Division.

17. TransCanada did not initiate any further conversations regarding settlement after May 3, 2005.

18. Hager called me a few times in early May, 2005. Hager asked on each occasion whether I had any further ideas to move forward with a settlement. Hager offered no ideas of his own, and I offered none either. I expressed to Hager my disappointment at the Division's response, and let him know the Division's framework could not work to resolve the dispute. Hager did not disagree. In my opinion, it was clearly understood between Hager and I that the settlement talks were at a standstill barring some entirely new approach or change of heart by the Division, since the Division had to approve any settlement and its current position was



3985809v1

unworkable. I also told Hager that my boss, Bill Taylor, was out of the office due to a death in the family so I had not been able to speak with him. I told Hager that I would give him a call if I came up with any additional settlement ideas. I did not tell Hager that TransCanada was considering accepting the Division's proposed revisions, and I did not discuss with Hager options to adjust the Division's proposed terms.

19. After Narragansett indicated it no longer wished to negotiate an arbitration agreement on April 20, 2005, Narragansett declined to ever respond to TransCanada's April 19, 2005 arbitration proposal, and never expressed further desire or willingness to arbitrate. Other than Winston's April 25 email to Kavanagh, TransCanada and Narragansett did not thereafter orally or in writing mention the draft arbitration agreement or the possibility of arbitration.

20. On May 17, 2005, TransCanada filed its Massachusetts Complaint. TransCanada filed its Complaint because settlement talks had proved fruitless in view of the Division's position, arbitration talks had broken down, and at that point TransCanada wanted the dispute resolved by a Court. Having decided to file suit, TransCanada decided to file its Complaint in Massachusetts because the WSOS Agreement is governed by Massachusetts law, TransCanada is a Massachusetts company, and TransCanada felt that the dispute was most appropriately and fairly resolved in a Massachusetts Court.

21. Also on May 17, 2005, I called Robinson to inform him that a Complaint had been filed. Winston also called Kavanah and left a telephone message for the same purpose. Winston left a message for Kavanah stating that he was calling as a courtesy to let Kavanah know that TransCanada had filed suit in Worcester Federal Court; that Narragansett would be served in Rhode Island in the next few days; that TransCanada had filed suit because at that point it wanted the matter resolved by a Court; and that, having chosen to file suit, it decided to file the

suit in Massachusetts as its preferred forum. Winston also stated that his and Kavanah's previous negotiations had been cordial; that the filing of the suit did not reflect an intent to increase the animus; and that he hoped he and Kavanah could continue the pleasant tone of their previous conversations. Winston then reiterated certain parts of his message in roughly the same words. He did not mention settlement or continuing settlement talks. Kavanah then called back and asked for a copy of the Complaint, and Winston emailed her a copy. [*See* Winston Aff. ¶4.]

22. On May 25, eight days after TransCanada's Massachusetts Complaint was filed, Hager called me to propose a new approach to settlement. Hager claimed that he had a particular replacement supplier that was ready to pick up TransCanada's WSOS contracts immediately, which would release TransCanada from the WSOS Agreement in a matter of months. This was an attractive proposal to TransCanada, and had never been mentioned before. Hager did not say who the replacement supplier was.

23. On May 26, 2005, Narragansett filed its Rhode Island Complaint.

24. Also on May 26, Kavanah called Winston. Kavanah stated "right back at 'atcha'," and that Narragansett had filed suit in Rhode Island. She said that Narragansett's filing of the Rhode Island Complaint did not mean that Narragansett did not want to settle, but that Narragansett just "wanted to preserve their rights" in Rhode Island. [*See* Winston Aff. ¶5.]

25. On May 27, 2005, Narragansett's counsel sent TransCanada's counsel a draft agreement reflecting the settlement structure first mentioned by Hager on May 26. This proposed settlement involved replacement of TransCanada by another specific wholesale supplier. Narragansett insisted that this settlement had to be completed by June 1. TransCanada sent a preliminary response the same day. [*See* Kavanah and Winston emails dated 5/27/05, attached as Exs. 18-19.] The parties thereafter exchanged multiple drafts of the proposed

agreement over the next 10 days, to attempt to complete the proposed settlement on the expedited basis required by Narragansett.

26. On June 7, 2005, TransCanada, Narragansett and the third-party replacement supplier executed various settlement-related agreement and related documents, consisting of several volumes, and filed them with the Rhode Island PUC. This overall settlement was expressly contingent on receipt of approval from the Rhode Island PUC and the Rhode Island Division. [*See* June 7 Filing Letter, attached as Ex. 20.]

27. The Division rejected the proposed settlement by letter dated June 29, 2003.

28. The parties discussed and pursued a proposed arbitration agreement only between on or around April 1, 2005 and April 19, 2005. The parties productively discussed settlement only between April 22, 2005 and May 2, 2005, and again between May 25, 2005 and June 29, 2005; the latter May-June discussions were based upon different terms than in earlier discussions and began only after the filing of TransCanada's Massachusetts Complaint and a day before Narragansett filed its subsequent Rhode Island Complaint. Throughout these negotiation periods, TransCanada maintained its right to pursue a court action if the arbitration could not be started expeditiously and on agreed terms or if an acceptable settlement proposal could not be agreed upon.

29. Narragansett answered TransCanada's Massachusetts Complaint on June 23, 2005. On July 1, 2005, TransCanada requested a Rule 26(f) conference with Narragansett's Massachusetts counsel. The Rule 26(f) conference finally occurred on August 26, 2005. Also on August 26, 2005, TransCanada served its automatic disclosures, as well as document requests



3985809v1

on September 14, 2005. A scheduling conference is set in the Massachusetts action for October 3, 2005.

Signed under the pains and penalties of perjury this 23rd day of September, 2005.

Michael Hachey

9/23/05

RICHARD P. SCHULER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 7, 2006



3985809v1